[Civ. No. 2437. Fourth Appellate District.—January 23, 1940.]

HENRY UPTON, Respondent, v. STEVEN TOTH et al., Appellants.

Albert H. Ford and Purnell E. Bingman for Appellants.

Clay & Handy for Respondent.

GRIFFIN, J.—This is an action for damages for eviction. The Rugby Land Company, a corporation, owned the farm lands in question. In 1933, this land was leased by a written lease to Ora Upton. An assignment of this lease to respondent Henry Upton, although disputed, is claimed. By the terms of the lease it expired November 15, 1937, but it contained a provision for termination in the event of a sale. The Rugby Land Company sold the land to Joe Toth and Charlie Toth, appellants, for $5,000 cash in May, 1937. They went into possession, and planted a crop of barley, which was matured in May, 1938, at the time of trial. Respondent Henry Upton had plowed the 375 acres of tillable land in March and April, 1937. He claims that in March, 1937, before he plowed, he had requested a written lease for a term of years on the property and that Mr. Baker, secretary of the corporation, had promised a written lease. This lease

was not given. Respondent also claimed that he had another conversation with Mr. Baker early in May, 1937, the date of which is not fixed, but which appears to have been after May 3, 1937, the date of the opening of the escrow on the sale to Joe and Charlie Toth, and prior to May 20, 1938, the date of the closing of the escrow.

When Upton learned of the pending sale he made an unsuccessful attempt to buy the land. The Toths offered to pay him for the plowing, but he did not accept. About June 23, 1937, he was notified not to trespass, and he filed suit alleging eviction as of that date. He recovered judgment against the new owners, Joe and Charlie Toth, and their father, Steven Toth, for the net value of the grain crop, fixed at $3,665.61.

The trial court found that on June 23, 1937, plaintiff "was in possession of said land pursuant to the written lease of December 20, 1933, the term of which was extended by the oral lease found" and that on said day "the defendants did unlawfully and without right evict plaintiff from said parcel"; "That it is true that on or about the 10th day of May, 1937, the plaintiff and the Rugby Land Company, which was then the owner of the said parcel of land, did enter into a *further lease* of the said parcel, the term of which was from the 15th day of November, 1937, to the end of the crop year of 1937–1938, and until on or about May 9th, 1938." (Italics ours.)

It is claimed first that this finding as to the oral lease is unsupported by the evidence. By respondent's own testimony an extension was necessary, as the lease would run out before the crop was harvested. In order to support a judgment for the net value of the grain crop respondent would have produced during the 1937–1938 season, it was obviously necessary to establish a lease extending until the end of that season.

Respondent was the only witness who testified that there was such a lease, and his testimony referred to two conversations with Mr. E. V. Baker, the secretary of the Rugby Land Company. His testimony was without any corroboration and was flatly contradicted by Mr. Baker. Conflict in the testimony is not the point, however. The point claimed is that respondent's own testimony does not support the finding and is contrary to the finding in several respects.

The conversation between Mr. Baker and respondent is claimed by him in reference to any oral lease or extension of the written lease herein to be in part as follows:

"Q. (By Mr. Clay to Mr. Upton): What was the subject of that conversation (of March, 1937)? A. I told Mr. Baker that my boys was ready to start plowing on his ranch, and that in order to protect me on the crop following, I would have to get an extension of the lease; that our present lease would run out before the crop was harvested. Q. What did he say? A. I continued and said, 'Do you want us to go ahead and farm the property?' He said ' . . . yes; go ahead and farm it. What . . . do you think I keep it for?' Q. Was anything else said on that occasion about this matter? A. I asked him to have his attorney draw the lease and send it over. Q. What did he say? A. He said he would. Q. What did you do then? A. We went ahead and plowed the land . . . Q. Did you have any further conversation with Mr. Baker? A. I did. When was that? A. The first week in May, 1937. . . . Q. What was said? A. I asked him why he didn't send the lease over. He said, 'Well, I might sell that property. I want to sell it'. He said, 'Wait until after harvest; possibly we might get together.' But in the meantime I said, 'I want the lease.' Mr. Baker said: 'I would rather not tie up this property for a long period of time. I want to sell it. I will only lease it to you from year to year.' Q. What did you say? A. I said, 'That is fine with me. I can get my crop off there within a year if I cut it for hay.' . . . Q. (By Mr. Ford): In March you had a conversation with him, you say? A. Right around the first of March, yes, sir. Q. And in that conversation did you ask him for a written lease? A. I asked him to renew the lease. Q. For what period of time? A. Two to four years, either one; either two or four years. Q. He said he would do it? A. No; he didn't say at that time. Q. What did he say in March when you asked him for a two or four year renewal? A. He said, all right, he would go ahead and renew it; but he did not say whether for two or four. Q. Was this conversation in March, 1937, the first conversation you had had with him relative to any extension or renewal or further leasing? A. That was the first conversation pertaining to an extension of the lease in any manner. The Court: What date was that? A. Around the first of March. I don't know whether the first

or second or third, but around the first of March. Q. And that was not a one-year lease that was mentioned at that time? A. No. At that time I was under the impression I would either get a two or four, whichever was his option . . . Q. (By Mr. Ford): In your conversation with Mr. Baker on the second occasion, when you say you had not received the desired lease for two to four years, and discussed the lease for a year, was the term or expression 'crop season' used? A. Yes, it was. Q. What did you say and what did he say in which the term 'crop season' was used? A. I wanted it to extend a sufficient length of time to protect me for the crop season. Q. Not what you wanted, please. What expression was used by you and by him? A. Well, he said he did not want to tie up the property for too long a period of time, but would rent it to me from year to year. I said, 'That is OK with me. That will protect me on my crop.' Q. Was the expression 'from year to year,' or the expression 'crop season' used in that conversation? A. 'From year to year' at that time, 'from year to year'.''

It is quite apparent from the record that respondent had little if any confidence in his claim of an oral lease as of May 10, 1937. By his own admission he subsequently suggested to Mr. Baker that the lease be put in writing, and called on his attorney for an opinion whether a written lease, made after the deed to the Toth Brothers had been signed, would sever the oral lease, and the attorney stated it would be of no effect as far as stopping the sale of the land was concerned. He thereupon employed his attorney to write a letter to appellants dated May 18, 1937, in which the attorney stated:

''We are advised by our client, Mr. Henry Upton, that you are negotiating the purchase of certain lands near Perris from the Rugby Land Company.

''No doubt you have knowledge that Mr. Upton is farming the said property and has recently plowed the same. Of course, such knowledge is constructive notice to you that Mr. Upton has an interest in the said property, but that you may have actual notice of the said interest, I am now informing you that our client has a lease on the said property to farm the same during the crop year of *1927–1928*. This letter is written that you may have notice of Mr. Upton's interest and that he, or you, will not be prejudiced in any transaction with the Rugby Land Company.

"Further, be advised, that although the lease has not been reduced to writing, I believe that Mr. Upton has an agreement with the Rugby Land Company to farm the said land for a period of three years from the close of the crop year of 1937–1938. As before noted, the same has not been reduced to writing but I am of the opinion it is valid and outside the Statute of Fraud for the reason certain consideration has passed between the Rugby Land Company and our client."

The legal effect of the May conversation was first alleged by respondent in his complaint to be an *"extension of the written lease"*. After the trial and rendition of an informal opinion, an amendment to the complaint alleged "a new original and oral lease", the amendment being filed June 21, 1938. On January 17, 1939, being the date when findings were filed, another amendment to the complaint alleged "a further lease" had been made. The finding is of a "further lease" but the conclusion of law is that the term of the written lease "was extended by the oral lease". It is therefore apparent that if the trial court adopted the first allegation that the oral lease only extended the term of the written lease, the extension contained the same provisions as the original lease. The provision for termination of the written lease, on sale of the property, would apply to the oral lease.

The written lease, expiring November 15, 1937, contained the following provision: "The party of the second part agrees in case of sale of land or all of said property by said first party to release the land sold reserving only the crop thereon and reasonable compensation for work done in preparing seed bed for future crop not yet seeded."

The general rule is that a sale by a lessor of real estate, during an unexpired leasehold term, under which a tenant is holding, where a condition is attached, does not of itself abrogate the lease, terminate the leasehold estate, or authorize the landlord to treat the lease as at an end without offering to fulfill the condition. Its effect is to substitute the vendee of the reversion to all of the rights of the original lessor. The vendee then becomes the landlord by operation of law and the tenant becomes a tenant of the vendee of the reversion. (*Otis* v. *McMillan & Sons*, 70 Ala. 46, 53; Jones on Landlord and Tenant, p. 480, sec. 427; *Diepenbrock* v. *Luiz*, 159 Cal. 716 [115 Pac. 743, Ann. Cas. 1912C, 1084,

L. R. A. 1915C, 234]; *McClung* v. *McPherson,* (1905) 47 Or. 73 [81 Pac. 567, 82 Pac. 13].)

■ From the record before us it appears that respondent apparently voluntarily surrendered possession of the premises, moved out of the house which was located on the land, and appellants peaceably went into possession thereof, and it was not until June 23, 1937, when appellants notified respondent not to trespass on the property and placed a "no trespassing" sign upon the premises that respondent considered himself evicted.

Thereafter, considerable negotiations between the parties ensued. Appellants, apparently in good faith, made an offer in writing to pay respondent for any work he had done upon the property. To this offer appellants received a reply from respondent's attorney containing the following: " . . . The reply of the Bank of Perris stated that Mr. Steven Toth wished Mr. Upton informed that he would pay for any work Mr. Upton had done on the property. In a conference with our client, he advised us to inform you that he does not wish to abandon his lease and as he has heretofore done a considerable amount of work in preparing for the 1937–38 crop, he intends to continue the same to harvest." However, after the date of the claimed eviction (June 23, 1937) respondent expressed a willingness to accept payment for the reasonable value of the work he had done on the property and stated that he would cancel any rights he might have. On July 28, 1937, Steven Toth again made a written offer to pay the reasonable charge of plowing the land and stated that he "thinks reasonable charge $1.00 per acre". Respondent did not consider or invite any further negotiations. The action for damages for eviction followed.

From the actions and conduct of respondent it seems quite clear to us that on being advised of the facts, he removed voluntarily from the premises and he also later refused to accept any offer of payment but elected to rely on his claimed oral lease. It therefore would appear that if appellants were obligated under the lease, to reimburse respondent before a termination would be effective, appellants were no longer obliged under the circumstances to make any further offer to respondent to pay for the cost of the plowing. (*Pierce* v. *Lukens,* 144 Cal. 397 [77 Pac. 996]; *Boschetti* v. *Morton,* 23 Cal. App. 325, 331 [137 Pac. 1085]; *Burg* v. *Harris,* 72 Cal.

App. 379 [237 Pac. 399]; 24 Cal. Jur., sec. 3, p. 514; *Druxinman* v. *Smith et al.*, 113 Wash. 124 [193 Pac. 224].)

The clause in the lease terminating it upon sale was intended by the parties to it to be a reservation in favor of, and for the benefit of, the lessor and is to be so interpreted. (Civ. Code, sec. 1069; *McVitty* v. *Flentge*, 34 Cal. App. 781 [169 Pac. 666].) Thus interpreted, it expressed briefly and somewhat vaguely, it is true, the evident intent of the parties that the owner of the premises should have the right to transfer to his grantee the right to possession thereof upon a sale, and thereby terminate the lease. The only limitation upon that right expressed in the clause conferring it had reference not to the time when the lease should be terminated but merely to the terms upon which the grantee of the premises might exercise his right to receive possession. If the land had been summer-fallowed, and it had, and the purchaser desired to obtain the benefit arising from such cultivation in the way of resultant crop, he was only obligated to make a *bona fide* offer to pay the lessee the amount expended by him in summer-fallowing the land, in order to obtain possession of the premises. This he must do immediately upon consummation of his purchase. (*McVitty* v. *Flentge, supra*.) A sufficient offer having been made, the rights of respondent under the written lease were thereby terminated, and on the date of the claimed eviction, respondent had no cause of action for eviction as against appellants. (*Walter* v. *Arnold*, 50 Cal. App. 457 [195 Pac. 460]; *McVitty* v. *Flentge*, 44 Cal. App. 426 [186 Pac. 610].)

The only remaining claim of respondent that he had been evicted from the premises must be based upon the alleged oral lease which the court found was to begin on November 15, 1937, and extend through the crop year of 1937–1938, and until on or about May 9, 1938. It has been repeatedly held that in the case of a lease for a term to begin in the future, the lessee is not regarded as a tenant until he enters upon the land, and he is said to have an *interesse termini*. (*Caldwell* v. *Center*, 30 Cal. 539 [89 Am. Dec. 131]; Tiffany on Landlord and Tenant, sec. 37, p. 290.) Respondent could not be evicted under the oral lease unless he had entered into possession. (*Kline* v. *Guaranty Oil Co.*, 167 Cal. 476 [140 Pac. 1]; Tiffany on Landlord and Tenant, p. 1268; 15 Cal. Jur., p. 679, sec. 89.)

From an examination of the testimony it appears to us that the conversation heretofore related, constituted an agreement to make a lease, rather than constituting a verbal lease, the terms of which were definite and certain. (*Regalia* v. *Mariani*, 100 Cal. App. 1, 5 [279 Pac. 455].) However, assuming but not holding the evidence sufficient to constitute an oral lease to begin November 16, 1937, under the authorities cited respondent, on June 23, 1937, the date of the claimed eviction, was not a tenant or in possession of the property under the oral lease, and a judgment for damages for wrongful eviction thereunder cannot be sustained.

Many other points are raised by appellants which have considerable merit. In view of the conclusion reached, however, we deem it unnecessary to decide them.

Judgment reversed.

Barnard, P. J., and Marks, J., concurred.