## HALL *v.* MAYOR AND CITY COUNCIL OF BALTIMORE

[No. 296, September Term, 1968.]

Decided *February 11, 1969.*

The cause was argued before HAMMOND, C. J., and MAR-BURY, McWILLIAMS, FINAN and SMITH, JJ.

*John T. Joseph,* with whom were *Richard W. Case* and *Smith, Somerville & Case* on the brief, for appellant.

*Allan B. Blumberg, Assistant City Solicitor,* with whom were

*George L. Russell, Jr., City Solicitor,* and *Ambrose T. Hartman, Deputy City Solicitor,* on the brief, for appellee.

HAMMOND, C. J., delivered the opinion of the Court.

In June 1968 Baltimore City officials published a request for bids on a lease and leaseback arrangement under which the successful bidder would construct a one-story warehouse on land owned and to be rented to him by the City at a nominal rent, the completed structure to be subleased back to the City for the same term as the lease at a yearly rent to be submitted with the bid. A form of lease and a form of sublease were published with the request for bids. On July 10, 1968, Calvert General Contractors Corp. (Calvert) submitted a bid in which it proposed to complete the warehouse within seven months and agreed to accept an annual rent of $96,000 for the original term of fifteen years.

Calvert's bid was accepted by the Board of Estimates after Mr. Charles L. Benton, Director of Finance of Baltimore City, wrote the Board that:

> "This warehouse is required to enable the Bureau of Purchases to perform the duties imposed upon it by the Charter. It is also needed to allow the Bureau to realize fully the efficiencies and consequent economies inherent in the centralized purchasing principle, while improving the speed and quality of its services to using City agencies.
>
> * * *
>
> "The Planning Commission as well as the Department of Finance, has consistently advocated the use of the lease-purchase method to obtain the buildings needed by the City *when they are needed* and *at reduced long term cost.* It is my opinion that Your Board's approval of this proposal will effect substantial savings to the City by comparison with alternative financing methods. These latter methods could not, in any case, be employed on a timely basis."

The lease from the City to Calvert of vacant land near City

Hospitals, and the sublease from Calvert to the City which has appropriate matching, corresponding and supplementing provisions, together provided that Calvert leased the land and completed warehouse thereon to the City at an annual rent of $96,000 payable in monthly installments of $8,000 for a term of fifteen years, renewable for another fifteen years, with an option to the City exercisable at any time after the first six months of the sublease during the original or renewal term to buy Calvert's leasehold interest at an appraised value of the premises and appurtenances mutually agreed upon by two licensed appraisers who are members of the Real Estate Board of Greater Baltimore, one selected by the City and the other by Calvert, with a similar appraiser to break a tie, if necessary. If the City does not exercise its option during the original fifteen-year term there will be an automatic renewal for another fifteen years, at a rental determined by licensed appraisers. If the City has not exercised its option at the end of thirty years, Calvert must remove the building within ninety days and restore the land.

The documents recite that the parties contemplate that Calvert will finance the project by mortgaging its leasehold interest, first by a construction loan and then by a permanent loan, and it was agreed in the lease and the sublease that all mortgages will be subordinate to the City's interest as lessor under the lease and its interest as sublessee under the sublease.

William G. Hall, who is a resident, property owner, taxpayer and voter in the City, filed a petition for a declaration, backed by an injunction, that the entire lease-back arrangement and its documentary components are unconstitutional and void because (1) they amount to the creation of a debt by the City forbidden by Article XI, § 7, of the Constitution of Maryland unless authorized by an act of the General Assembly and an ordinance of the City submitted to and approved by the voters of the City; (2) they violate Art. V, Sec. 5, of the Charter of the City (1964 Revision), that the City may lease land only if it is not needed for public purposes; and (3) they violate the competitive bidding requirements of Art. VI, Sec. 4, of the Charter.

Judge Carter considered the documents, the testimony and a stipulation that Calvert had calculated its bid so that the annual

rent of $96,000 will (a) pay the installments of principal and interest on the construction and permanent loans as they mature so that there will be no mortgage encumbrance at the end of fifteen years; (b) pay the ordinary and reasonable expenses related to the warehouse which Calvert is obligated to pay under the arrangement; (c) pay income taxes resulting to Calvert because of the arrangement; and (d) return a reasonable profit to Calvert. The City has not had and will not have any direct part in Calvert's financing plans.

An experienced and concededly competent realtor testified without contravention that not only was the rent of $96,000 a year a fair rent but the City "is actually getting a good value," since it is paying $1.20 a square foot in cash for space which would bring $1.63 on the open market and (adding 20 cents for taxes which the City foregoes and 8 cents for the value of the land capitalized at $6\frac{1}{2}\%$) can be considered costing the City a total of $1.48 a square foot.

Judge Carter held that the arrangement between the City and Calvert did not create a debt of the City within the meaning of the constitutional provision of Art. XI, § 7, that:

> "no debt * * * shall be created by the Mayor and City Council of Baltimore * * * unless such debt * * * be authorized by an Act of the General Assembly of Maryland, and by an ordinance of the Mayor and City Council of Baltimore, submitted to the legal voters of the City of Baltimore * * * and approved by a majority of [such votes] * * *,"

but rather was a bona fide lease from Calvert to the City at a fair and reasonable rental and not, because of the purchase option, a disguised purchase available to the City at no consideration other than the rentals or a nominal consideration. His reasons included the fact that the City has no requirement or compulsion to buy; the price, if the City does buy, is determined by an appraisal of fair value at the time the option is exercised and that a real lease with a real option to buy does not create a debt under the authorities. We agree with Judge Carter's decision on this point, and essentially with his reasons for his decision.

Constitutional debt limitations throughout the country began at the State level long ago and when such limitations in the public mind unduly restricted the ability of the States to finance needed improvements, the debt-incurring powers of local governments were called upon, and such governments being unrestricted constitutionally could and did go ahead with excessive debt financing. Local debt increased very rapidly until the business crisis of 1873 brought about many municipal defaults caused by excessive and unwise debt. Debt limitations on local governments were imposed between 1851 and 1886 in great numbers, particularly between 1872 and 1879. Many localities had gone into debt heavily to finance railroads. The crisis of 1873 revealed the weakness of many of these financings and as a result almost every State now has limitations on the extent to which local government may incur indebtedness. See Magnusson, *Lease-Financing by Municipal Corporations,* 25 Geo. Wash. L. Rev. 377, 381 (1957) ; Rogers, *Municipal Debt Restrictions and Lease-Purchase Financing,* 49 A.B.A.J. 49 (1963).[1] Maryland did not escape the epidemic of financial illness, in fact had quite a severe case, and State and local constitutional debt limitations followed here as elsewhere. *Johns Hopkins Univ. v. Williams,* 199 Md. 382; *Pressman v. Baltimore,* 200 Md. 107.

To escape the strictures of such debt limitations, local governments engaged private contractors to perform municipal services over a period of years for a compensation to be paid annually or as the services were rendered. A number of cases sustained such contracts and their reasoning pointed the way to the next step, which was to convert the contracts for services into contracts leasing the facilities that produced the services. Originally, water for hydrants and gas for street lighting often were obtained by municipalities on an annual basis. In acquir-

---

**1.** See also Bowers, *Limitations on Municipal Indebtedness,* 5 Vand. L. Rev. 37 (1951); Bowmar, *The Anachronism Called Debt Limitation,* 52 Iowa L. Rev. 863 (1957); Note, *Constitutional Limitations on Indebtedness of Local Governments in Missouri,* 1957 Wash. U.L.Q. 59; Note, *Constitutional Restrictions Upon Municipal Indebtedness,* 1966 Utah L. Rev. 462; Comment, *Municipal Corporations—Circumventing Municipal Debt Limitations,* 48 Mich. L. Rev. 1016 (1950).

ing the facilities, a way around a debt limitation was to lease the hydrants and lampposts at a fixed rental per hydrant or post, with the right in the municipality to acquire the water or light system when the aggregate rentals reached a certain sum or upon paying a balance due. City halls, court houses and jails were built under the same financial scheme. The annual payment rule was held in many cases to sustain the rent transaction, although there were holdings to the contrary. See Magnusson, *supra,* pp. 382-384, "History of Lease-Financing in the Courts."

The appellant argues earnestly that the City, by binding itself to a long-term lease and reserving an option to purchase, is creating a debt under another name and supports his position that the arrangement constitutes an integrated transaction for the long-term financing and ultimate permanent acquisition of the warehouse by the City with these arguments:

(a) "If the City itself had borrowed funds secured by a mortgage or issued its general obligation bonds to raise funds for the Project, clearly a debt within the meaning of Section 7 would have been created. Instead, it has chosen to convey the realty to Calvert which will borrow the necessary funds, construct the Project and then rent it back to the City over its *entire useful life.* Obviously, Calvert serves in the arrangement as a borrowing conduit for the City, and an expensive one at that, because it is apparent that the City will pay a much higher rate of interest on the funds Calvert borrows (interest on Calvert's loan is actually paid by the City through the $96,000 a year rental payments) than would the City had it issued its general obligation bonds to raise funds for the Project. Interest on the City's bonds is tax exempt and it is common knowledge that such bonds bear a lower rate of interest than do evidences of indebtedness, the interest on which is not tax exempt.

(b) "The amounts paid as rent are not necessarily the use value of property as true rent would be, but are designed to equal debt amortization * * *.

(c) "Any prudent investor or securities analyst would consider 'rental payments' on lease-financing contracts, along with outstanding bonded indebtedness, as repayment of a long-term debt and not as current expenses.

(d) "This type of financing is, in reality, an attempt to anticipate income of future years. Note, *Constitutional Limitations on Indebtedness of Local Governments in Missouri,* 1957 Wash. U.L.Q. 59, 67 [and see Magnusson, *supra,* pp. 390-393, 'IV. Lease Financing is Borrowing Not Renting,' 'The Leases are in Practice Non-Terminal,' and 'Direct Relation of "Rent" to Debt Service on Bonds']. As is pointed out below, therein lies its most serious disability, for the true lesson in *Baltimore v. Gill,* 31 Md. 375 (1869), the first and probably foremost case construing Section 7, is that it is the possibility of future taxation which determines whether a Section 7 debt has been created. The City's lease-financing arrangement, presents not the possibility but the absolute certainty of future taxation."

As forceful as the arguments of the appellant abstractly may be, we find the law to be against him in the case at bar. The City has the power to become a lessee of and pay rent for buildings needed in or for the performance of its ordinary and regular municipal functions. Charter of Baltimore City (1964 Revision), Art. I, Sec. 1, Art. II, Sec. (2), and Art. V, Sec. 5 (a). If the City had leased the warehouse in question for two, three or five years at the fair rental value of $96,000 a year, the effect necessarily would have been to require imposition of taxes to raise the rent money in each subsequent year of the lease term but this would not have made the agreement to pay rent over a term of years legally a debt. At common law, rent to fall due beyond the current period is not a present debt. 3 Tiffany, *Real Property* (3rd Ed.), § 879; 2 *American Law of Property,* § 9.44. Not only was this the law when the constitutional debt limitation come into being, but our predecessors have at various times held that this rule of the common law is still

the law of Maryland. It was said in *Real Estate Board of Baltimore v. Page,* 164 Md. 500, 504: "[A] covenant to pay rent creates no debt until the time stipulated for the payment arises." In *Boulevard Corp. v. Stores Corp.,* 168 Md. 532, 539, Chief Judge Bond for the Court said that the common law conception of rents prevails in Maryland and went on to hold that:

> "According to that conception, rent is not the result of an ordinary contract for future payments of money, certain to accrue. The land is the debtor, 'yielding and paying' the rents at the stipulated intervals; the covenant to pay is an accessory one; and in advance of the rent day there is no present debt for future payment. 'Rent issues from the land, is not due until the rent day, and is due in respect of the enjoyment of the premises let.' *Wm. Filene's Sons v. Weed,* 245 U. S. 597, 601, 38 S. Ct. 211, 213, 62 L. Ed. 497; *Gardiner v. William S. Butler & Co.,* 245 U. S. 603, 38 S. Ct. 214, 62 L. Ed. 505. There have been many expressions of dissatisfaction with the result of this old conception, but the court feels bound by its uninterrupted acceptance in this state [citing texts and several Maryland cases]."

To the same effect are *Wyatt v. State Roads Comm.,* 175 Md. 258, 268, and *Lochner, Receiver v. Martin,* 218 Md. 519, 524. In *Wyatt,* Chief Judge Bond for the Court said:

> "According to all decisions known to us, even if ascertained amounts are now agreed to be paid in the future, as, for instance, rentals, this would not be the contracting of a debt in the constitutional sense. 'There is a distinction between a debt and a contract for a future indebtedness to be incurred, providing the contracting party perform the agreement out of which the debt may rise,' [as was said in *City of Walla Walla v. Water Co.,* 172 U. S. 1, 43 L. Ed. 341]."

See also *Lacher v. Board,* 243 Md. 500, 512.

Thus the execution by the City of a bona fide long-term lease of a building necessary or useful in the proper conduct of mu-

nicipal business does not create a debt as that term is used in § 7 of Art. XI of the Constitution of Maryland. *Baltimore v. Gill,* 31 Md. 375, does not, as appellant urges, require a holding to the contrary. There, the City pledged stock of the Baltimore and Ohio Railroad Company in order to raise $1,000,000 to invest in bonds of the Western Maryland Railroad Company. The General Assembly had not authorized the pledge and the ordinance had not been submitted to the voters of the City. The Court held that the pledge of City owned property created a constitutionally prohibited debt. The appellant relies on a statement in the opinion that the intent of § 7 of Art. XI is to restrain the City from "imposing additional burdens upon the citizens, which may directly or indirectly involve increased taxation." The precise holding of *Gill* was that a pledge or mortgage of existing municipal assets creates or constitutes a debt and the impact of the decision has been limited to that precise holding. *Lacher v. Board, supra,* at p. 508 of 243 Md.; *Larch v. Maryland Port Authority,* 240 Md. 438, 453-458. It is to be noted that there is no pledge of municipal assets here, the leases being subordinate to the City's interests. While Calvert may pledge its leasehold interest in the City's land to obtain financing, in both the lease and the sublease, it is expressly provided that Calvert's pledge of its leasehold interest shall be subordinate to the City's interest as the sublessee and its interest as lessor of the lease.

The language as to imposing of additional burdens of taxation, relied on by the appellant, refers and is applicable to the creation of a debt by the City, which in turn requires or increases taxation, as is made clear by a reading of the pertinent parts of the opinion, which say that "either upon the general credit of the City or by a pledge of its revenue and assets; *thereby* creating a debt *and* imposing additional burdens [of taxation]." (Emphasis added) Almost every municipal activity costs money which must come from taxes but manifestly the performance of these activities or the agreement to perform them in years to come does not create a debt in the constitutional sense. In *Wyatt,* the State, through the State Roads Commission, had agreed to pay over a period of years the costs of maintenance, repairs and operation of a bridge to be built by

money raised from the sale of bonds, the interest and principal of which were to be paid from tolls paid by users of the bridge. It was argued that this contractual undertaking by the State to maintain, repair and operate the bridge created a debt forbidden by Art. III, § 34, of the Maryland Constitution. The Court rejected the argument, speaking through its Chief Judge Bond to say:

> "But the bridges are to belong to the State from their beginning, and in this the State undertakes only its ordinary function with regard to its highways, to be paid for as a current expense of government. If it should buy or build a bridge, paying for it at once from money in the treasury or money borrowed as usual, it would take up this duty of maintenance, repair, and operation at once from its current funds, and, however great the burden might appear to be, it would not be said that a debt in the constitutional sense, that sort of debt which caused the insertion of this constitutional clause, had then been contracted. * * *

> "The Constitution does not prohibit all burdens, or require all contracts of the State, to be accompanied by laws for levies of taxes to meet them. It deals with burdens of a kind. And an undertaking to pay undetermined, undeterminable, amounts of the cost of maintenance, repair, and operation in the future from day to day, month to month, and year to year, as need arises, if it can be classed as containing an element of debt at all, is not one for which taxes to pay interest and principal, and to pay the principal completely in fifteen years, might be provided in a tax law. There can be no principal and interest in such a contract obligation. If it should be met out of the general road maintenance funds it would be, more exactly, a contract for maintenance, work, and labor. No money at the outset will be owed to any one. Money can become payable only to various persons, at various times, in various amounts, as may be called for by future conditions in the bridges. However heavy the burden

might possibly become, the contract to carry it is not such a debt with principal and interest as is dealt with by the Constitution. Whatever debt there might be, would be a debt of the future, and the contract would fall in with the distinction between a debt and a contract to incur future debts." [175 Md. pp. 267-268]

This language was quoted with approval in *Lacher* at pp. 511-512 of 243 Md.

We come then to the question of whether the option given the City to purchase the property during the term of the lease changes the bona fide valid lease into an agreement to purchase the warehouse, which constitutes a debt and thereby violates the constitutional restriction. We think it clear that the option to purchase has no such effect. The rentals are fair and reasonable compensation for the occupancy and use of the warehouse, no part of the rent is to be applied to or credited on the purchase price (compare *Beckwith Machinery Co. v. Matthews,* 190 Md. 182, holding a purported lease to be a sale because the option price was the same as the aggregate rental payments for which the purported lessee was given credit), the option is completely and truly non-compulsory, and the purchase price is to be determined by appraisal of real value at the time of the exercise of the option. 2 Antieau, *Municipal Corporation Law,* § 15:34, p. 427; *State, ex rel. Thomson v. Giessel* (Wis.), 72 N.W.2d 577; *Protsman v. Jefferson-Craig School Corp.* (Ind.), 109 N.E.2d 889; *City of Los Angeles v. Offner* (Cal.), 122 P. 2d 14 (substantially on all fours with the case before us); *County of Los Angeles v. Nesvig,* 41 Cal. Reptr. 918, 921; *Stedman v. Berlin* (Wis.), 73 N. W. 57. See Annotation, "Lease of Property by Municipality * * * with Option to Purchase as Evasion of Constitution * * * Limitation of Indebtedness," in 71 A.L.R. 1318, 1326, in which the annotator concludes that:

> "Where the lease is, in fact, intended as a lease, and the rentals are in fact such, rather than payments on the purchase price, the courts, without exception, hold that such a lease of property by a * * * political subdivision, with an option to purchase the same at a

fixed price in addition to the rentals, does not create an indebtedness or liability within the meaning of a constitutional or statutory limitation of indebtedness."

The annotation was updated in 145 A.L.R. 1362 and the same annotator found the subsequent cases supported the conclusion he reached at 71 A.L.R. 1326. 38 Am. Jur., *Municipal Corporations,* § 467. See also 15 McQuillin, *Municipal Corporations* §§ 41.16, p. 333, and § 41.26, p. 359.

The rationale of the cases upholding a lease of real estate containing a true option to purchase as a lease is that of the Uniform Commercial Code, Code (1964 Repl. Vol.), Art. 95B, § 1-201 (37) in its tests of whether an instrument is a lease or a security instrument, the primary test being the intent of the parties revealed by the facts of each case with these guides and standards:

"however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security."

See *Crest Investment Trust, Inc. v. The Atlantic Mobile Corporation,* 252 Md. 286, for an application of these tests. The rationale of that decision strongly supports, if it does not compel, the result we reach in the present case. *City of Phoenix v. Civic Aud. & Con. Cent. Ass'n* (Ariz.), 408 P. 2d 818, relied on by the appellant, is a case in which the aggregate of the rental payments or of most of them were a credit against the purchase price and the transaction was held to constitute a purchase with security for the seller that amounted to a debt owed by the purchaser. Most of the cases cited in the secondary sources relied upon by appellant are based on similar factual circumstances.

Judge Carter found the appellant's claims that the Charter of the City was violated in two particulars under the arrangements

between the City and Calvert and the procedures followed by the City to be unfounded. We agree and adopt the reasons he gave as follows:

"The petitioner's second contention relates to Article V, Section 5 (c) of the Baltimore City Charter which provides:

"The Department [of Real Estate] is authorized to lease any building or parcel of land (or any other real property) *not needed by the City for public purposes,* on a month to month basis, unless otherwise provided by ordinance. It is also authorized to lease such property for fixed terms provided such leases are first approved by the Board of Estimates.' (Emphasis supplied)

"This Court agrees with the City's position that the land in its present condition is not needed for public purposes. It is clear that the City need not keep the property unoccupied. See *Gottlieb-Knabe v. Macklin,* 109 Md. 429. Since the City is not required to keep the property vacant, it would seem to be an unreasonable restriction upon the City in the use of its property, to prohibit the City from leasing the land which in turn causes it to be used for a public purpose. Certainly the spirit if not the letter of Article V, Section 5 (c) has in fact been complied with by the City.

"The petitioner's third contention relating to the alleged noncompliance by the City with the competitive bidding requirements of Article VI, Section 4 of the Charter of Baltimore City, must also fail. It would be pure speculation on the court's part, to assume that the City would ever exercise its option to buy. Considering the case in its present posture reveals that the lease and sublease were both let by competitive bidding which is not at all required by Article VI, Section 4. The option to purchase was a part of the original competitive bid and this was done in full compliance with the Baltimore City Charter requiring public bidding for public work."

We are persuaded that the lease-lease-back arrangement before us does not offend the Constitution of Maryland or the Charter of the City.

*Order affirmed, with costs.*