ARTHUR TREACHER'S FISH & CHIPS OF FAIRFAX, INC. ET AL. v. CHILLUM TER- RACE LIMITED PARTNERSHIP

[No. 4, September Term, 1974.]

*Decided November 4, 1974.*

The cause was argued before SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Harvey R. Clapp, III,* with whom were *Venable, Baetjer & Howard* on the brief, for appellants.

*Stanley H. Kamerow* for appellee.

LEVINE, J., delivered the opinion of the Court.

We are presented here with the uncommon issue of when a lease is not a lease. Following the announcement by appellant, Arthur Treacher's Fish & Chips of Fairfax, Inc. (Fairfax), that it would not occupy the restaurant building being renovated for it by appellee on the latter's premises, an action was brought against Fairfax for unpaid rent. The trial judge (Bowie, J.) held that the instrument which had been executed by the above-named parties, and which had been guaranteed on behalf of Fairfax by appellant, National Fast Food Corporation (National), was a lease. For the breach thereof by Fairfax, he awarded judgment to appellee in the amount of $28,402.44. This represented unpaid rent which had accrued as of the trial date less certain credits for

expenses which the court found appellee would not be required to incur by reason of the breach. National and Fairfax appeal from that judgment.

The facts material to the issues raised on this appeal are essentially free of dispute. Following negotiations, which had commenced in late 1970, the parties executed the instrument dated March 25, 1971, which is the subject of this conflict. The premises involved consisted of a parcel slightly less than one acre in size located at the intersection of Queens Chapel and Jamestown Roads in Prince George's County. The property was improved by a restaurant, then vacant, that had been occupied until mid-1970 by another national fast-food concern. In the course of their preliminary negotiations, the parties discussed the length of time which appellee would require to renovate the building to conform to the national image of restaurants operating under the trade name and motif of "Arthur Treacher's Fish & Chips." While the trial testimony reflects some mild disagreement over what was said concerning this particular matter, it is clear that Fairfax desired completion of the remodeling work somewhat earlier than was possible.

Another important subject of these discussions was the financial security of Fairfax. When the major spokesman for appellee raised this question, he was informed that National would guarantee any lease agreement entered into by Fairfax. An appropriate investigation of National's credit standing provided appellee with the assurance it was seeking. That the guaranty was material to appellee was subsequently underscored by appellee's refusal to sign the instrument — even conditionally — until the guaranty had been signed by National as well as the lease itself by Fairfax.

Ultimately, the instrument entitled "Lease Agreement" (and hereafter so denominated), prepared in appellee's office, was forwarded in early January 1971 to Fairfax at its office in Ohio for inspection and signature. On February 10, Fairfax's president, a member of the Ohio Bar specializing in real estate, in the company of another corporate officer,

visited appellee's office where they both executed the lease agreement. On March 15, the guaranty was signed by National and returned to appellee, whereupon the latter signed the lease agreement on March 25. Neither appellant requested nor made any change in the lease agreement or the guaranty prior to affixing its signature thereon.

No useful purpose would be served by quoting the lease agreement in detail. Suffice it to say that it is a formal instrument and contains many, if not all, of the provisions usually found in modern commercial leases. The entire document is punctuated with references to itself as a lease and to the parties as lessor and lessee. The initial term was to be for a period of ten years commencing on "the first day of the calendar month following the date of completion [of the renovations]." It was further "expressly understood and agreed that the relationship between the parties . . . at all times [was to] remain that of Lessors and Lessee." Although appellee undertook to remodel the existing building, the lease agreement was silent regarding the completion date. The basic minimum annual rental — the maximum being calculated as "[10%] of all gross sales for the lease year" — was to be $22,000. We quote here the relevant portion of the guaranty:

> "FOR VALUE RECEIVED and *to induce Chillum Terrace Limited Partnership to enter into the foregoing Lease* as [sic] with Arthur Treacher's Fish & Chips of Fairfax, Inc., as LESSEE, NATIONAL FAST FOOD CORPORATION, a Delaware Corporation, *guarantees* to the LESSOR'S [sic] their heirs, executors, administrators, personal representatives and assigns full payment of all rent *and prompt and full performance of all of the terms, covenants and conditions* provided by said Lease to be *paid,* performed or observed by the LESSEE, its successors or assigns *during the term of said Lease.*" (emphasis added)

By April 14, 1971, appellee's architect had prepared and

submitted preliminary drawings of the demolition and remodeling work. Approximately three weeks later, Fairfax approved these plans in writing without making any changes. The architect then commenced the preparation of "working drawings," which were completed and forwarded to Prince George's County on or about June 1, 1971. On June 16, after reviewing those plans, the County Health Department submitted a list of items which required attention before it would agree to the issuance of the necessary building permit. This precipitated an exchange of correspondence between appellee and Fairfax, interspersed by an occasional telegram, in which appellee urged the lessee to give the health department requirements its immediate attention, and in response to which, the latter insisted that it had fully complied with those requests. In any event, this obstacle was apparently resolved satisfactorily by September 7, the date on which the building permit was issued to appellee.

Prior to receiving the building permit, appellee had commenced to demolish portions of the existing structure, and had removed the equipment which had remained on the premises following the departure of the previous tenant. Upon receiving the building permit, appellee began the reconstruction process. This work was interrupted by a letter from National dated November 2 in which it said that since appellee ". . . has not performed its part of the purported lease, this notification is given that the guaranty of [National] is cancelled and void, effective immediately." This message was followed by a letter from Fairfax dated November 14 in which it said that:

> ". . . due to the length of time it has taken Chillum Terrace to submit tentative plans for the remodeling, Arthur Treacher's Fish & Chips of Fairfax, Incorporated hereby declares the terms of the above-referenced lease wholly breached by Chillum Terrace Limited. Therefore you are hereby instructed to desist any further work as contemplated by the terms of the lease and are

hereby informed that Arthur Treacher's Fish & Chips of Fairfax, Incorporated, will not, under any circumstances, lease the referenced premises."

Considerable attention was devoted at the trial to the expenses incurred by appellee. The total cost required to renovate the building would have been $45,000. As of the cessation date in November 1971, $17,643.51 of that sum actually had been expended, and an additional $5,000 had been paid by appellee to a real estate broker for procuring Fairfax as a tenant. It was estimated that it would have cost between $40,000 and $45,000 to restore the building from its November 1971 state to its original condition prior to the execution of the lease agreement.

At the conclusion of a four-day trial, Judge Bowie, sitting without a jury, concluded that the instrument executed on March 25, 1971, was, indeed, a valid lease agreement; that, since it was silent regarding the date for completing the reconstruction work, appellee was to have been afforded a reasonable time in which to do so. He found that February 1, 1972, the date by which appellee said it could have completed its work, and, therefore, when the lease term would have commenced but for appellants' breach, was such a reasonable time. Thus, he concluded, the action taken by Fairfax in November was unreasonable and constituted a breach of the lease agreement. For this, appellee was entitled to the amount of rent which had accrued as of the trial date accounting from February 1, 1972, less certain costs which, as lessor, it would have incurred had the premises been occupied for the full term of ten years. Accordingly, appellee was awarded a judgment of $28,402.44 against both appellants, recovery being allowed against National upon the guaranty.

However strenuously appellants may have argued in the circuit court that they are not liable to appellee in any amount because of the failure of a condition precedent, *viz.*, completion of the work, they now concede in this Court that they are foreclosed by the trial judge's factual determinations from successfully maintaining that they had

not breached the lease agreement. They earnestly contend, however, that since the lease term had never commenced, the proper remedy was not the allegedly unpaid rent. Therefore, they urge, the correct measure of damages which the trial judge should have applied was one appropriate for breach of contract, rather than one for failure to pay rent due under a lease. Similarly, National denies any responsibility as guarantor on the ground that under the express terms of the guaranty, liability could not fasten until the lease term had actually commenced.

These arguments are countered by appellee who maintains that the trial judge properly awarded unpaid rent, since the lease was binding despite the absence of an immediate right to possession. Its rationale is that it was the unreasonable conduct of Fairfax, as found by the trial judge, which prevented commencement of the lease term. Therefore, the proper remedy for this breach of the lease was the recovery of unpaid rent which had accrued as of the trial date. Alternatively, appellee contends that it also furnished uncontradicted evidence sufficient to support a proper award based upon breach of contract. Further, appellee says, the guaranty signed by National was absolute and unqualified in its terms, and liability attached thereunder in the event of a default by Fairfax.

Accordingly, we are confronted with these issues:

1. Did the trial court, in awarding unpaid rent, apply the correct measure of damages for the breach committed here?

2. If not, what was the measure of damages which properly should have been applied?

3. Was the guarantor liable for the default of Fairfax?

(1)

Whether the correct measure of damages was applied here hinges on the nature of the written instrument found by the trial judge to have been breached and the resulting status of the parties. As we may have suggested earlier, precisely

what the nature of the purported lease agreement was seems to have been misunderstood at various stages of the proceedings by both parties. At one point below, appellants argued that there was no lease, but merely a contract to enter into one. The reasoning behind this argument appears to have been that the lease could not commence until the condition precedent, completion of the work, had been performed. At other times, it has taken the position that it was both a lease, which never "came into effect," and a contract. Appellee, on the other hand, has consistently maintained — and the trial judge so held — that notwithstanding the postponement of possession by the lessee, the agreement was a lease rather than a contract to enter into a lease. As it happens, both views are partially correct.

Fundamentally, a lease is both a contract and a conveyance of a leasehold estate in land:

> "Much has been written about the nature of a lease, whether a conveyance or, as in the civil law, a contract. The obvious answer is that it is both. Originally the lessee's rights were purely contractual, but from the sixteenth century onward his interest has been as fully protected as that of the owner of any possessory interest in land. The lease operates to convey a possessory estate to the lessee. . . ." 1 *American Law of Property*, § 3.11 (A. J. Casner ed. 1952).

The instrument of lease is thus both an executory contract and a present conveyance, creating between the parties both privity of contract and of estate, *Beckett v. City of Paris Dry Goods Co.*, 14 Cal. 2d 633, 96 P. 2d 122 (1939); *Davidson v. Minnesota Loan & Trust Co.*, 158 Minn. 411, 197 N. W. 833, 32 A.L.R. 1418 (1924); 3 G. Thompson on Real Property, § 1046 (1959 Repl.); 49 Am.Jur.2d, *Landlord and Tenant*, § 1 (1970). Therefore, the obligations which the parties bear to each other may arise out of contract or from the real covenants of the leasehold estate, or sometimes from both. Generally, enforcement of the real covenants is independent

of the contract obligations in the instrument; the former obligations arise out of and inhere in the estate itself. *Stone v. Sullivan,* 300 Mass. 450, 15 N.E.2d 476, 116 A.L.R. 1223 (1938); *Barry v. Frankini,* 287 Mass. 196, 191 N. E. 651, 93 A.L.R. 1240 (1934); *see Leitch v. New York Cent. R. Co.,* 388 Ill. 236, 58 N.E.2d 16, 155 A.L.R. 835 (1944).

One such obligation which arises out of the leasehold estate is rent. As we said in *Hall v. City of Baltimore,* 252 Md. 416, 250 A. 2d 233 (1969):

> "According to that conception, rent is not the result of an ordinary contract for future payments of money, certain to accrue. The land is the debtor, 'yielding and paying' the rents at the stipulated intervals; the covenant to pay is an accessory one; and in advance of the rent day there is no present debt for future payment. 'Rent issues from the land, is not due until the rent day, and is due in respect of the enjoyment of the premises let.' . . ." (citations omitted) 252 Md. at 424.

It is this conception of rent as part of the leasehold estate, which accounts for the rule that rent is payable even when other covenants of the lease are breached.

Although a lease is both a contract and a conveyance of a leasehold interest in land, it need not convey a present interest. It may create a future possessory estate, a leasehold to commence in futuro. *Motels of Md. v. Balto. County,* 244 Md. 306, 311, 223 A. 2d 609 (1966). This may occur when a lease contains words of present conveyance, but the term of the lease does not begin until a future date. Such a conveyance is comparable to a deed creating a future interest in fee simple. The grantee acquires an estate in land; but it is a future interest, not a present possessory interest.

Under the common law, until the lessee enters, he has no estate [in land], but only an *interesse termini,* a right to enter. *Interesse termini* applies in two situations, where the term stated in the lease has commenced but the lessee has not taken possession, and where there is a lease to take

effect in the future. *American Law of Property, supra,* § 3.22. Thus, one who is a lessee under a validly executed lease to commence in the future immediately becomes the owner of a future interest, a right of entry, which will ripen into a possessory estate when the term commences and when the lessee enters. The lessee acquires no possessory estate until the term commences and he enters upon the land. *Upton v. Toth,* 98 P. 2d 515, 519 (Cal. Dist. Ct. App. 1940); *Howard v. Manning,* 79 Okla. 165, 192 P. 358, 12 A.L.R. 819 (1920); *Simon v. Kirkpatrick,* 141 S. C. 251, 139 S. E. 614, 54 A.L.R. 1348 (1927); *E.I. DuPont de Nemours and Co. v. Zale Corporation,* 462 S.W.2d 355, 358 (Tex. Civ. App. 1970); 49 Am.Jur.2d, *Landlord and Tenant,* § 15 (1970).

Consequently, when a lessee breaches a lease agreement prior to entering into possession, he cannot be held liable for rent, because the leasehold estate has never come into existence as a present possessory interest, and rent is an incident of the leasehold estate. In *Simon v. Kirkpatrick, supra,* where the lessee refused to take possession when it was tendered, the court held that the tenant could not be held liable for rent, since the landlord-tenant relationship had never commenced and the estate had not come into existence. The court, however, apparently relying upon the contract facet of the lease, held the lessee liable for breach of contract and awarded appropriate damages.

It follows from the application of these principles to the instrument in this case that the trial judge was correct in holding that it was a lease. He should have ruled, however, that it was merely a present conveyance of a future leasehold interest, the term of which was to commence in futuro, following completion of the improvements. Since a future leasehold interest was created which never became possessory, the allowance of unpaid rent was not a proper remedy. Nevertheless, as we have already intimated, the lease agreement was also a contract, the breach of which entitled appellee to damages appropriate to such cases.[1]

---

1. We find it unnecessary for our purposes to draw a distinction between an agreement to enter into a lease and a lease which has not yet become possessory, since, in either event, the measure of damages, being governed by contract principles, is the same.

(2)

It does not appear that we have addressed ourselves directly to the proper measure of damages to be applied in cases where a proposed tenant has breached either a lease prior to the commencement of its term or a contract to make a lease. Other courts, however, have done so, and the general rule which seems to have emerged is that the proposed lessor may recover the excess, if any, of the agreed rent over the reasonable rental value of the premises as of the date of the breach, *Jefferson Realty v. United States Rubber Co.*, 222 So. 2d 738, 742 (Fla. 1969); *Cooper v. Aiello*, 93 N. J. Law 336, 107 A. 473, 475 (1919); *Dickerson v. Menschel*, 188 App. Div. 547, 177 N. Y. Supp. 376, 381 (1919); *Simon v. Kirkpatrick, supra*, 139 · S. E. at 617; *Branning Mfg. Co. v. Norfolk-Southern R. Co.*, 138 Va. 43, 121 S. E. 74, 79-80 (1924); *Oldfield v. Angeles Brewing & Malting Co.*, 62 Wash. 260, 113 P. 630, 631, 35 L.R.A. (N. S.) 426, Ann. Cas. 1912C, 1050 (1911); 49 Am.Jur.2d, *Landlord and Tenant*, § 23 (1970); *see H. S. & D. Inv. Co. v. McCool*, 9 P. 2d 809, 811 (Ore. 1932); *Massie v. State Nat. Bank*, 11 Tex. Civ. App. 280, 32 S. W. 797, 798 (1895). Most authorities enunciating this rule also have added to such excess rent those special damages which the proposed lessor may plead and prove to have resulted from the breach.[2]

Some courts have said that the correct measure to be applied in such cases is the difference between the rent reserved and what the proposed lessor is able to obtain by the exercise of reasonable diligence following the breach. *Post v. Davis*, 7 Kan. App. 217, 52 P. 903, 905 (1898); *Ocean City Co. v. Johnstone*, 110 N. J. Law 596, 598, 166 A. 307, 309 (1933); *Cooper v. Aiello, H. S. & D. Inv. Co. v. McCool, Massie v. State Nat. Bank*, all *supra*; *American Law of Property, supra*, § 3.17; *see Amick v. Metropolitan Mortgage & Securities Co.*, 453 P. 2d 412, 417 (Alaska 1969). Superficially, this appears to be at odds with the general rule quoted earlier, especially since the rationale for the former is its comparability to the breach of a contract for

---

2. No evidence of such special damages was presented by appellee here.

the sale of real estate, in which the measure of damages is the difference between the contract price and the fair market value of the property at the time of the breach, *Kasten Constr. Co. v. Jolles,* 262 Md. 527, 531, 278 A. 2d 48 (1971). The issue also appears to have been obfuscated somewhat by the fact that some courts have purported to equate these two measures of damages with each other while recognizing apparent differences between them, *Cooper v. Aiello, Massie v. State Nat. Bank, Oldfield v. Angeles Brewing & Malting Co.,* all *supra.*

One might have assumed, as we have suggested, that the term "reasonable rental value" in a lease situation is analogous to "fair market value" in a sale context. We find virtually no supporting authority, however, for this proposition. Indeed, two courts have flatly equated reasonable rental value with the sum which the lessor, by the exercise of reasonable diligence, could have obtained as a rental from others during the entire term of the lease, *H. S. & D. Inv. Co. v. McCool, Branning Mfg. Co. v. Norfolk-Southern R. Co.,* both *supra.*

We shall follow the general rule, therefore, and adopt as the proper measure of damages to be applied in this case the excess of the rent reserved under the lease agreement over the reasonable rental value of the premises at the time of the breach in November 1971. With the support of two courts and the tacit authority of three others, and finding none to the contrary, we are persuaded to define reasonable rental value as that sum which the proposed lessor, by the exercise of reasonable diligence, could have obtained or did obtain as a rental from others during the entire term of the lease.

From our perusal of the record, we find support for appellee's contention that, in an apparent excess of caution, it also presented sufficient proof to support this measure of damages. But, since the determination of reasonable rental value is one to be properly made by the trier of fact, we shall remand the case for that purpose. In light of what we have said concerning the record, no further evidence need be entertained by the circuit court.

(3)

Lastly, we turn to a consideration of whether National may be held liable as guarantor, particularly in light of our earlier holding that the lease term had not yet commenced. As we have previously noted, National argues with considerable force that its guaranty was confined to ". . . the *term* of said lease." (emphasis added) A summary of the facts leading to the execution of the guaranty is in order.

It is manifestly clear that appellee would not have entered into the lease without the guaranty by National. Indeed, it even refused to sign the lease subject to receipt of the guaranty, insisting that the guaranty be signed first. All this indicates to us that it was the intention of the parties that the guaranty cover all the obligations of the lease, and not merely those arising during the leasehold term. By insisting on the fully executed guaranty before it signed the lease, appellee clearly demonstrated that it intended to protect its rights accruing before the commencement of the term as well as those which would become operative during the term.

The language of the guaranty, itself, indicates that it was intended to blanket all of the obligations arising under the lease. In short, it was designed to place the guarantor in the shoes of the obligor with respect to all obligations which the latter bore to appellee. The guaranty begins with these words: "For value received and to induce Chillum Terrace Limited Partnership *to enter* into the foregoing Lease . . . ." (emphasis added) We think it clear that this broad language of intent demonstrates that the parties meant the guaranty to cover all the terms of the lease, those arising out of the contract as well as those arising out of the estate. This is confirmed by the phrase, "guarantees . . . full payment of all rent *and* prompt and full performance of all of the terms, covenants, and conditions provided by said Lease . . . to be *paid* . . . ." (emphasis added) To us, this means that National was guaranteeing payment of the contract obligations as well as the rent.

To the extent that the phrase, "during the term of said

lease," may be construed to limit the guaranty to those obligations arising during the term of the leasehold itself, it is in conflict with the intent manifested by the two phrases previously mentioned. Hence, the guaranty must be construed to resolve this ambiguity.

> "A contract of guaranty is a form of commercial obligation, which should be construed *in furtherance of its spirit,* without strict technical nicety, to promote liberally the use and convenience of commercial intercourse. The words of a guaranty should receive a fair and reasonable interpretation *to effectuate the intention of the parties, and the circumstances accompanying the transaction may be considered* in seeking the intention of the parties. The court should give the instrument that construction which will best accord with the intention, as manifested by the language in the light of all the surrounding circumstances, without stretching the words beyond their import in favor of the creditor or restricting them in aid of the guarantor." *Greenwell v. American Guaranty,* 262 Md. 102, 108, 277 A. 2d 70 (1971) quoting *Gordon v. State National Bank,* 249 Md. 378, 384, 239 A. 2d 915 (1968) and *Walton v. Hospital Association,* 178 Md. 446, 450, 13 A. 2d 627, 128 A.L.R. 970 (1940) (emphasis added).

Applying this principle to the circumstances surrounding the guaranty transaction, it is clear to us that the parties intended the guaranty to cover all the obligations of the lease, those arising before the commencement of the term as well as those arising thereafter. In short, the intention of the parties should be given full effect. Therefore, National, the guarantor, is liable to the same extent that Fairfax is liable under the lease agreement.

> *Affirmed in part; reversed in part; remanded for determination of damages; appellants to pay two-thirds of costs, appellee to pay one-third.*