WILLIAM F. EBERHART, JR. ET UX. *v.* MAYOR AND
CITY COUNCIL OF BALTIMORE, ET AL.

[No. 3, September Term, 1981.]

*Decided August 25, 1981.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Roger D. Redden,* with whom was *David M. Funk* on the brief, for appellants.

*Robert A. Shelton,* with whom were *Jacques T. Schlenger, Ronald B. Sheff, Benjamin L. Brown, City Solicitor,* and *William Hughes, Associate City Solicitor,* on the brief, for appellees.

MURPHY, C. J., delivered the opinion of the Court. SMITH and DIGGES, JJ., dissent. SMITH, J., filed a dissenting opinion at page 115 *infra,* in which DIGGES, J., concurred.

The primary issue in this case is whether a sale-leaseback transaction, which the Mayor and City Council of Baltimore (the City) proposes to enter into, contravenes the debt limitation provisions of Art. XI, § 7 of the Constitution of Maryland:

> "[N]o debt . . . shall be created by the Mayor and City Council of Baltimore . . . unless such debt . . . be authorized by an Act of the General Assembly of

Maryland, and by an ordinance of the Mayor and City Council of Baltimore, submitted to the legal voters of the City of Baltimore . . . and approved by a majority of the votes cast . . . ."

In 1975, the City purchased for approximately $110,000 a parcel of land (the Land) and a building and improvements thereon (the Building) known as 19-21 South Gay Street, Baltimore, Maryland (collectively, the Property). The City spent $1,450,000 remodeling and renovating the Building, making it suitable for use as a specialized cooking school. The Building is now occupied, under a rent free at will lease, by Baltimore's International Culinary Arts Institute, Inc. (the Institute), a non-profit charitable and educational corporation. Under an agreement with the City, the Institute uses the Property as a cooking school, providing educational and training programs to prepare students for employment in the food service and hospitality industries and operating a restaurant and general catering service.

The City now proposes to extract the capital it has invested in the Property without affecting the Institute's continued rent free use of the Property. In order to do this, the City proposes to engage in a series of transactions with Culinary Associates, a limited partnership. The City will sell the Building to Culinary Associates for $1,550,000. The Land will be leased to Culinary Associates for a period of thirty-five years (the Ground Lease). Both the Land and the Building then will be leased back to the City by Culinary Associates under a thirty-year lease (the Ground and Building Lease).

Of the $1,550,000 that Culinary Associates needs to purchase the Building, $1,270,000 will be provided from the proceeds of the sale of Industrial Development Revenue Bonds (the Bonds) to be issued by the Industrial Development Authority of the Mayor and City Council of Baltimore (the Authority). The Authority is a body politic and corporate and "a political subdivision of the State," organized under Maryland Code (1957, 1978 Repl. Vol., 1980 Cum. Supp.), Art. 41, §§ 266 A-1 to A-3, and

authorized to issue bonds for certain enumerated public purposes. The proceeds of the sale of the Bonds will be loaned by the Authority to Culinary Associates pursuant to a loan agreement (the Loan Agreement) yet to be prepared. Culinary Associates' repayments under the Loan Agreement will be sufficient to enable the Authority to meet its obligation to make periodic payments of principal of and interest on the Bonds.

By resolution adopted on October 29, 1979 (the Authority Resolution), the Authority's Board of Directors authorized the issuance of the Bonds and the loan of the proceeds to Culinary Associates.[1] The Resolution provided that the Bonds will be limited obligations of the Authority, with debt service thereon payable solely from repayment of the loan by Culinary Associates: "Neither the Bonds, nor the interest, nor redemption premium, if any, thereon, shall ever constitute an indebtedness or a charge against the general credit or taxing powers of the Authority, the Mayor and City Council of Baltimore, the State of Maryland, or any other body corporate or politic of the State of Maryland, within the meaning of any constitutional or charter provision or statutory limitation, and neither shall they ever constitute or give rise to any pecuniary liability thereof." The Resolution also provided, pursuant to Art. 41, §§ 266 A-2 and 266 B (f), that conditions of unemployment exist in Baltimore City, and that helping Culinary Associates to acquire the Building will serve to relieve such conditions of unemployment, will promote the economic development of Baltimore City, will aid in the creation of a balanced economy in Baltimore City, and will promote the health, safety and welfare of the residents of Baltimore City.

As security for payment of principal of and interest on the Bonds, Culinary Associates will grant a mortgage on the Building and its leasehold interest in the Land, which will

---

1. The Authority Resolution stated that the purchase price for the Building was to be $1,700,000, and authorized the issuance of $1,390,000 in Bonds. The record does not explain the discrepancy between these figures and the figures contained in the parties' stipulation of facts. In any event, the discrepancy is not relevant to the issues in this case.

be assigned to the trustee for the Bonds (the Trustee). This mortgage will be subordinate to the City's interests as tenant under the Ground and Building Lease and as fee simple owner of the Land. The right to receive the City's rent payments under the Ground and Building Lease also will be collaterally assigned to the Trustee as security for the Bonds.

Culinary Associates will raise the remaining $280,000 of the purchase price for the Building through capital contributions of its limited partners. The annual rent to be paid by the City to Culinary Associates under the Ground and Building Lease will be equal to the sum of (i) the annual rent reserved under the Ground Lease, (ii) an amount sufficient to enable Culinary Associates to meet its obligations to the Authority under the Loan Agreement, and (iii) an amount sufficient to return a profit to Culinary Associates of 3% per annum of its total equity investment of $315,000 ($280,000 contributed toward the purchase price of the Building, plus $35,000 in incidental financing costs). Because the amount of the City's obligation to pay rent to Culinary Associates is dependent in part on the amount of Culinary Associates' obligation to the Authority under the Loan Agreement and the amount of this obligation, in turn, is dependent on the amount of the Authority's debt service on the Bonds, the exact amount of the City's annual rent under the Ground and Building Lease cannot be fixed until the Bonds have been sold and their interest rate determined. According to uncontroverted expert testimony, however, the City's annual rent payments during the entire term of the Ground and Building Lease would be $141,635, plus the amount of the annual rent reserved under the Ground Lease. These rental payments will come from the City's general funds, and were deemed to represent the fair rental value of the property by a qualified expert.

Under the Ground Lease and the Ground and Building Lease, the obligations of Culinary Associates and the City, as the respective tenants, to make rent payments will not be reduced or affected by damage, destruction or partial taking

by condemnation (or sale in lieu thereof) of the Property. Both the Ground Lease and the Ground and Building Lease will terminate upon a complete taking by condemnation (or sale in lieu thereof) of the Property. In the event of damage, destruction or partial taking of the Property, the City will be obligated under the Ground and Building Lease to repair or restore the Property, but Culinary Associates will make available to the City for this purpose all insurance or condemnation proceeds it receives with respect to such damage, destruction or partial taking.

The Ground Lease imposes upon Culinary Associates the responsibility for providing casualty and liability insurance on the Property, for paying taxes and other assessments on the Property, for paying for all utilities provided to the Property and for maintaining the Property in a safe and lawful condition during the thirty-five-year term of the Ground Lease. During the thirty-year term of the Ground and Building Lease, however, these obligations will be placed on the City as tenant thereunder. The Ground Lease provides that Culinary Associates shall have the right at any time during the term thereof to remove or demolish any improvements on the Land, subject again to the City's rights as tenant during the thirty-year term of the Ground and Building Lease. During the five-year "gap period" between the end of the Ground and Building Lease term and the end of the Ground Lease term, the documents involved in the proposed transaction will place no significant restrictions on Culinary Associates' use or disposition of the Building. Upon termination of the Ground Lease, any improvements then remaining on the Land shall automatically become the fee simple property of the City.

The proceeds of the sale of the Building to Culinary Associates will be used by the City for as yet undesignated capital projects related to development. These projects are not required to be related to the Property in any way, and the City does not now anticipate that those proceeds will be used for capital projects related to the Property. The City, the Authority and Culinary Associates are committed to proceed with the proposed transaction, subject to a favorable ruling

by this Court, final agreement on all the terms and provisions of the documents and the rendering of approving opinions by counsel. None of the operative documents will be executed or delivered and the Bonds will not be sold until these events have occurred.

William and Linda Eberhart are Baltimore City property owners, taxpayers and voters. On May 22, 1980, they filed suit for injunctive and declaratory relief in the Circuit Court of Baltimore City, praying that the court declare the sale-leaseback transaction and related bond issue to be unlawful and permanently enjoin the City and the Authority from undertaking these transactions. The suit was initiated at the request of the City pursuant to and in compliance with the procedures established in *Reyes v. Prince George's County,* 281 Md. 279, 380 A.2d 12 (1977).[2] The Eberharts urged before the circuit court, as they have before us, three grounds upon which the proposed transaction and bond sale should be declared unlawful. First, because "debt" will be created within the meaning of Art. XI, § 7 of the Maryland Constitution, the City's failure to adhere to the requirements of that constitutional provision pertaining to creation

---

**2.** This Court in *Reyes, supra,* established the following guidelines for maintenance of a suit of this nature:

"A declaratory judgment suit having as a proper party a governmental body, or an agency or official thereof ... which action involves the validity of a statute or governmental regulation having the force of statute, or an urgently needed determination affecting future governmental conduct, and in which the public's concern is both imperative and manifest, need not hereafter necessarily be dismissed as collusive by a court of this State if there is strict adherence to the following procedures: (1) that the court is informed by the party actually initiating, promoting or financing the litigation, at the time of filing of that party's initial pleading, that the opposing party, though having standing to maintain the suit, nonetheless appears in a manner which may render the action collusive; (2) that the party actually desiring the requested adjudication bind itself, in such manner as may be prescribed by the court, to pay at the court's direction such fees and other expenses of counsel appointed in the manner provided next below; and (3) that the court name counsel, without recommendation or suggestion by any party to the action, to present in the same manner and to the same extent as though representing a truly adverse party, a position in opposition to that taken by the party who initiated and for whose benefit the action was instituted." 281 Md. at 299-300, 380 A.2d at 24 (footnote omitted).

of debt renders the proposed transaction unconstitutional. Second, that the Baltimore City Charter does not permit the proposed sale of the property. Third, that the bond issue will be invalid because the Bonds will not be issued for any of the permissible purposes enumerated in Art. 41, § 266 A-2.

The circuit court (Greenfeld, J.) rejected each of these arguments, finding the proposed sale-leaseback and bond issue to be lawful. The Eberharts appealed to the Court of Special Appeals, and we granted their petition for writ of certiorari prior to consideration of the case by the intermediate appellate court.

## I

As heretofore indicated, Art. XI, § 7 of the Constitution of Maryland provides that no "debt" shall be created by the City unless authorized by the General Assembly, and by a City ordinance approved by a majority of the voters. The City concedes that it has not complied with the constitutional prerequisites for authorizing the creation of "debt." Thus, if the proposed sale-leaseback and bond issue will create debt within the meaning of § 7, the transaction must be declared illegal.

State constitutional debt limitations first appeared in this country in the middle of the nineteenth century. Similar limitations were subsequently imposed upon local governments as fiscal irresponsibility on the part of local officials became a problem. *See* Magnusson, *Lease-Financing by Municipal Corporations As A Way Around Debt Limitations,* 25 Geo. Wash. L. Rev. 377 (1957). Constitutional debt limitations at the state level first appeared in Maryland in the 1851 Constitution and were retained in the present Maryland Constitution of 1867 as Art. III, § 34.[3] In *Johns*

---

3. Art. III, § 34 provides in pertinent part:

"No debt shall be hereafter contracted by the General Assembly unless such debt shall be authorized by a law providing for the collection of an annual tax or taxes sufficient to pay the interest on such debt as it falls due, and also to discharge the principal thereof within fifteen years from the time of contracting the same . . . ."

*Hopkins Univ. v. Williams,* 199 Md. 382, 86 A.2d 892 (1952), the Court discussed the intended purpose of Art. III, § 34:

> "The unquestionable historical reason for the proposal of the constitutional section . . . was to curb the reckless and improvident investment of public funds in aid of railroads and canals, promoted by private corporations, organized primarily for profit to their stockholders, although they might eventually serve a public purpose. That was the evil that had impaired or threatened the credit of [this] and other states, and that was the evil primarily in the minds of the framers of our constitution of a hundred years ago." *Id.* at 398-99, 86 A.2d at 900.

The adoption of Art. XI, § 7 seems to have been motivated by similar concerns. This provision first appeared in the Maryland Constitution of 1867. While information concerning the Constitutional Convention of 1867 is sparse, it is known that the Committee Upon Public Works and Corporations, which recommended adoption of Art. XI, § 7 to the Convention, was assigned to investigate various financial undertakings of the Mayor and City Council of Baltimore. The City had made heavy financial commitments to various railroad and canal companies. The Committee reported, for example, that the City had loaned to the Baltimore and Ohio Railroad Company $5,000,000 and owned $3,500,000 of its stock. *Proceedings of the State Convention, of Maryland, to Frame a New Constitution* 545 (Colton, 1867). By 1870, the City's actual investment in or contingent liability to private railroad companies amounted to approximately $15,000,000. LXVI Pol. Sci. Q.411,431 (1951). Although nothing in the reported proceedings of the Convention directly links the adoption of Art. XI, § 7 to the City's heavy financial involvement with the railroads, it appears that this involvement was a motivating force to the Convention delegates who adopted the constitutional provision. Subsequent judicial interpretations of Art. XI, § 7, as well as the substantially similar State constitutional debt limitation provision contained in Art. III, § 34, have

adhered to this view. *See Hall v. City of Baltimore,* 252 Md. 416, 250 A.2d 233 (1969); *Johns Hopkins Univ. v. Williams, supra,* 199 Md. at 398-99, 86 A.2d at 900.

Against this historical background, we consider each of the Eberharts' three arguments concerning the creation of debt. The sale-leaseback transaction is challenged independently of the bond issue on two grounds. First, it is argued that the sale-leaseback is invalid because in substance, if not form, the transaction will involve the pledge of an existing municipal asset and therefore the creation of debt under *Mayor and City Council v. Gill,* 31 Md. 375 (1869). Second, that the thirty-year Ground and Building Lease, notwithstanding the holding in *Hall v. City of Baltimore,* 252 Md. 416, 250 A.2d 233 (1969), will create debt within the meaning of Art. XI, § 7. The parties' contentions on the issue of debt focus on whether *Gill* or *Hall* should control the outcome of this case.

*Gill* contains the first judicial discussion of the meaning of Art. XI, § 7. There, the Mayor and City Council of Baltimore had passed an ordinance authorizing the City to pledge Baltimore and Ohio Railroad Company stock as security for a loan of $1,000,000, the proceeds of which were to be used to aid the Western Maryland Rail Road Company in its construction projects through purchase of that railroad's bonds. The City argued that no debt would be created by the pledge of stock because all it had done was change the form of its investment — from valuable Baltimore and Ohio Railroad stock to Western Maryland Rail Road bonds with no apparent market value. The City emphasized that the stock would be the sole security for the loan, and no additional taxes would be levied in the event of a default. The Court rejected the City's arguments, finding that debt would be created by the proposed transaction and making the following observations about the meaning of the word "debt," in the context of its use in Art. XI, § 7:

"If money be borrowed by the Mayor and City Council, which, by the contract, is to be repaid, it is immaterial to inquire whether the city is liable to be

sued therefor, or its payment be secured by the pledge or hypothecation of specific property held by the city, it would be in our judgment, equally the creation of a debt, within the meaning of the Constitution in one case as in the other. The Constitution is not to have a narrow or technical construction; but must be understood and enforced, according to the plain and common sense meaning of its terms.

"The plain intent of this section is to restrain the municipal government of Baltimore from borrowing money, except for the purposes and in the manner prescribed, either upon the general credit of the city, or by a pledge of its revenues or assets; thereby creating a debt, and imposing additional burdens upon the citizens, which may directly or indirectly involve increased taxation." 31 Md. at 390.

The broad language quoted above suggests that whenever the City proposes to take action that might directly or indirectly involve increased taxation, it must first comply with the procedures set out in Art. XI, § 7 because that action necessarily will involve the creation of debt. This interpretation of Art. XI, § 7, however, has been rejected. The fact that action by the City may result in increased taxation does not necessarily mean that debt will be created. As we noted over 100 years later in *Hall,* 252 Md. at 425, 250 A.2d at 239, "[t]he precise holding of *Gill* was that a pledge or mortgage of existing municipal assets creates or constitutes a debt and the impact of the decision has been limited to that precise holding." *Accord, Lacher v. Board of Trustees,* 243 Md. 500, 508, 221 A.2d 625, 629 (1966); *Lerch v. Md. Port Authority,* 240 Md. 438, 458, 214 A.2d 761, 772 (1965).

In *Hall,* the City proposed to lease a lot it owned to a contractor that would build a warehouse on the lot and then lease both the ground and the warehouse back to the City. The warehouse lease was to run for an initial fifteen-year term, giving the City the option to purchase the warehouse

after six months at a price to be set by real estate appraisers. The lease would be automatically renewed for an additional fifteen years after expiration of the initial term, and at the end of thirty years the contractor, as owner of the warehouse, would have ninety days to remove the warehouse from the lot. The parties contemplated that the contractor would mortgage its interest in the lot and the warehouse to finance the cost of construction. The City's annual rental payments would be sufficient to cover the contractor's debt service, return a reasonable profit to the contractor, pay for certain expenses related to the warehouse, and pay income taxes incurred by the contractor because of the transaction. Uncontradicted expert testimony revealed that the City's annual rent payments represented the fair rental value of the warehouse.

Hall, a City resident and taxpayer, challenged the proposed lease and leaseback on the ground that the transaction would create debt within the meaning of Art. XI, § 7. In essence, Hall argued that the City's long-term lease obligation, with annual rent based in large part on the amount of the contractor's debt service, was indistinguishable from a mortgage. Because the City would clearly incur debt if it borrowed funds directly to construct a warehouse, having the contractor serve as a conduit for borrowing the funds, Hall argued, should not make any difference under Art. XI, § 7. The Court disagreed, pointing first to the historical difference between payment of rent and debt obligations involving the payment of principal and interest:

> "At common law, rent to fall due beyond the current period is not a present debt. 3 Tiffany, *Real Property* (3rd Ed.), § 879; 2 *American Law of Property*, § 9.44. Not only was this the law when the constitutional debt limitation came into being, but our predecessors have at various times held that this rule of the common law is still the law of Maryland. It was said in *Real Estate Board of Baltimore v. Page*, 164 Md. 500, 504: '[A] covenant to pay rent

creates no debt until the time stipulated for the payment arises.' In *Boulevard Corp. v. Stores Corp.,* 168 Md. 532, 539, Chief Judge Bond for the Court said that the common law conception of rents prevails in Maryland and went on to hold that:

'According to that conception, rent is not the result of an ordinary contract for future payments of money, certain to accrue. The land is the debtor, "yielding and paying" the rents at the stipulated intervals; the covenant to pay is an accessory one; and in advance of the rent day there is no present debt for future payment. "Rent issues from the land, is not due until the rent day, and is due in respect of the enjoyment of the premises let." *Wm. Filene's Sons v. Weed,* 245 U. S. 597, 601, 38 S. Ct. 211, 213, 62 L. Ed. 497; *Gardiner v. William S. Butler & Co.,* 245 U. S. 603, 38 S. Ct. 214, 62 L. Ed. 505. There have been many expressions of dissatisfaction with the result of this old conception, but the court feels bound by its uninterrupted acceptance in this state [citing texts and several Maryland cases].' "

252 Md. at 423-24, 250 A.2d at 238.

The Court held that:

"[T]he execution by the City of a bona fide long-term lease of a building necessary or useful in the proper conduct of municipal business does not create a debt as that term is used in § 7 of Art. XI of the Constitution of Maryland." *Id.* at 424-25, 250 A.2d at 238.

Because the City's lease with the contractor was a bona fide lease, the Court concluded that no debt would be created by the lease-leaseback transaction.

The Eberharts contend that *Gill* rather than *Hall* is dispositive of the current litigation. *Gill* is controlling, they argue, because Culinary Associates' ability to retake the

Building in the event of the City's default on the Ground and Building Lease means that the City will pledge an existing municipal asset, the Building, to secure a loan — the $1,550,000 to be paid to the City for the Building. The City responds that *Gill* is distinguishable because the Building will be sold to Culinary Associates prior to execution of the lease agreement. Thus, argues the City, no existing municipal asset will be involved.

The Court held in *Gill* that a pledge or mortgage of existing municipal assets creates or constitutes a debt. Here the Building is to be sold outright for a sum certain, not pledged to secure a loan as in *Gill.* Art. XI, § 7 does not apply to the sale of a municipal asset. Indeed, had the City in *Gill* chosen to sell its Baltimore and Ohio Railroad stock and then use the proceeds to buy Western Maryland Rail Road bonds, the transaction would not have been subject to challenge under Art. XI, § 7. To conclude that this Court's distinction between an outright sale and subsequent leaseback of a municipal asset and the pledge or mortgage of a municipal asset permits the City to do indirectly what it cannot do directly is to say nothing more than Art. XI, § 7 was intended to control only certain kinds of transactions, and not the entire range of economic activity engaged in by the City that involves the expenditure of tax dollars. Whether the City will "pledge" the Building is irrelevant. The Building will not be an existing municipal asset once it is sold and therefore no debt will be created under *Gill.*

Anticipating that we might reject *Gill* as controlling precedent, the Eberharts next argue that the proposed long-term Ground and Building Lease will create debt. Recognizing that *Hall* is plainly contrary to this position, they urge us to overrule our decision in that case. The Eberharts contend that the City's obligation to pay rent under the Ground and Building Lease will be an unconditional, enforceable, general obligation, involving the pledge of the City's full faith and credit. As such, they argue, these payments are indistinguishable from an obligation to make debt service payments on a mortgage, which clearly would constitute debt. The distinction between rent and debt

made in *Hall* is said to be a meaningless one that fails to conform with reality. The City concedes that the obligation to pay rent will be a full faith and credit obligation. It contends, however, that the *Hall* Court's distinction between rent and debt is supported by the common law and should be retained.

This Court indicated in *Hall* that the City is empowered to enter into short-term leases without being subject to Art. XI, § 7, and that the City can be forced to raise money to make rental payments under the leases. We do not understand the Eberharts to dispute the City's ability to enter into a short-term lease, nor to fail to appreciate the burden that would be placed on the City if it was forced to abide by the cumbersome procedures of Art. XI, § 7 every time it wanted to enter into a lease agreement. The Eberharts nevertheless seem to urge that a lease agreement is somehow transformed into a debt when the term of the lease is extended beyond several years. We fail to see how this transformation occurs. Obviously, there must be something other than the term of a lease that determines whether a lease agreement is a disguised debt. As we held in *Hall,* the central question is whether the lease is bona fide. If the Ground and Building Lease is a bona fide lease, no debt will be created by the obligation to make rental payments thereunder.

Uncontradicted evidence was presented to the circuit court that the City's estimated annual rental payments under the Ground and Building Lease would represent the fair rental value of the Property. The correlation of the City's rental payments to Culinary Associates' debt service obligation does not, therefore, destroy the essential character of the Ground and Building Lease as a lease. Because the rent reserved under the Ground and Building Lease represents the fair rental value of the Property, and there are no factors that suggest a contrary result, the Ground and Building Lease is a bona fide lease. Thus, the City's obligation to make rental payments will not create debt even though the obligation to pay rent is an enforceable, full faith and credit obligation of the City.

Aside from the common law distinctions between rent and debt that were noted in *Hall,* one meaningful distinction between an Art. XI, § 7 debt and an obligation to pay rent under a bona fide lease is that by definition a bona fide lease involves the exchange of value for value. Before a lease can be deemed bona fide, the rental payments must represent the fair rental value of the item or property to be leased. On the other hand, municipal debt in its most common form — a mortgage or pledge of property — carries with it no inherent check on the economic wisdom of the participating government officials. In *Gill,* the City proposed to place at risk valuable railroad stock in order to make a large investment in bonds without any apparent market value. This kind of transaction was not uncommon at the time. The adoption of Art. XI, § 7 placed a significant check on the City's power to incur this kind of debt and, as a result, controlled the City's ability to enter into financially risky transactions with the railroads. By contrast, a bona fide lease necessarily involves an economically balanced transaction and provides a check on use of the taxpayers' money beyond the judgment of government officials. Thus, it makes sense to interpret Art. XI, § 7 as limiting the incurment of "debt" while allowing bona fide lease transactions to proceed unencumbered by constitutional restrictions.

The Eberharts' third and final argument relating to the creation of debt involves the connection between the City's rental payments under the Ground and Building Lease and payment of debt service on the Bonds. The Bonds will create debt, the Eberharts contend, because they will be paid ultimately out of the City's general tax revenues. The Eberharts argue that the passing of the City's rental payments, originating from general tax revenues, through Culinary Associates and then to the Authority, does not alter the fact that the City's general tax revenues will be used to pay the Bonds. To bolster this argument, the Eberharts point out that Culinary Associates will assign its right to receive rent payments under the Ground and Building Lease to the Trustee, thus rendering the City ultimately

liable for payment of principal of and interest on the Bonds. The City argues that the original source of the money used to pay the Bonds is irrelevant. The City's bona fide rent payments are to be made to a group of private investors, Culinary Associates. The fact that Culinary Associates will use a portion of the rent to pay the Authority's loan, money that will be the Authority's sole source of funds for meeting its debt service obligations on the Bonds, does not mean, the City submits, that it will incur debt.

The Bonds are to be issued by the Authority pursuant to Art. 41, §§ 266 A-I (c). Sections 266 A-I provide generally for the issuance of bonds by counties and municipalities, the proceeds of which are to be used to acquire, or to assist private concerns in acquiring, industrial buildings or port facilities. Under §§ 266 A-1 to A-3, counties and municipalities, including Baltimore City, have the option of creating an "industrial development authority" that can perform the bond issuing functions given to counties and municipalities under §§ 266 A-I (c). The City, by ordinance and other appropriate steps described in § 266 A-1, has exercised this option and created the Authority. The Authority operates under the mandate of § 266 A-2:

> "An authority shall be created and operated, and its powers exercised, solely to accomplish one or more of the following public purposes of its incorporating municipality or county; relief of conditions of unemployment; encouragement of increase of industry and a balanced economy; assistance in retention of existing industry through control, reduction, or abatement of pollution of the environment; promotion of economic development; protection of natural resources; and promotion by means of the foregoing of the health, welfare, and safety of residents of the incorporating municipality or county. The incorporating municipality or county may utilize the authority's exercise of its powers to accomplish one or more of those public purposes."

The Bonds to be issued by the Authority will be subject to the limitations of § 266 D (d):

"The bonds and interest thereon shall be limited obligations of the municipality or county, the principal of and interest on which shall be payable solely from the revenue derived from the leasing or sale or any other revenue derived from such industrial building or buildings or port facility. Neither the bonds nor interest coupons issued under the authority of this subheading shall ever constitute an indebtedness or a charge against the general credit or taxing powers of the issuing municipality or county within the meaning of any constitutional or charter provision or statutory limitation and neither shall ever constitute or give rise to any pecuniary liability of the issuing municipality or county."

The Resolution adopted by the Authority's Board of Directors tracks the language quoted above, and the Bonds issued pursuant to the Resolution will therefore at least facially comply with the restrictions of § 266 D (d).

The Eberharts' argument that the bond issue will create Art. XI, § 7 debt is based upon their assertion that the Authority is simply the "alter ego" of the City and that as a practical matter the two technically distinct entities must be considered a single entity. The relationship between the City and the Authority is crucial. Art. XI, § 7 applies only to the City. If the City and the Authority are a single entity, then the Authority's bond issue should be judged under Art. XI, § 7. This would mean that the Authority's bond issue would be tantamount to an issuance by the City and would therefore create Art. XI, § 7 debt. On the other hand, if, as the City argues, the City and the Authority are separate entities, then Art. XI, § 7 is inapplicable by its own terms. Art. XI, § 7 would have no direct impact on the Authority's ability to issue the Bonds, and would be relevant only in determining whether the City's role in the financing of the bond issue will create debt.

The provisions of Art. 41, §§ 266 A-I indicate that an industrial development authority is not simply the alter ego or instrumentality of the county or municipality which creates it. An authority is a body politic and corporate and "a political subdivision of the State." Section 266 A-3 mandates that none of the five members of the board of directors that govern an authority and exercise its powers by resolution may be officials or employees of the incorporating county or municipality. A director, although appointed by the incorporating county or municipality, may be removed only for misfeasance, neglect of duty, or other good cause. § 266 A-3 (b) (7). Section 266 A-3 (a) provides that the incorporating county or municipality may exercise its own powers under §§ 266 A-I even though it has chosen to incorporate an authority with similar powers. These various statutory provisions suggest that an authority is a distinct entity from its incorporating county or municipality. We believe that for purposes of the debt limitation provision of Art. XI, § 7, the City and the Authority must be treated as separate entities.

Having rejected the Eberharts' premise, we must nevertheless address their argument that the ultimate use of the City's rental payments to meet the Authority's debt service obligation on the Bonds creates Art. XI, § 7 debt. This question, like the other Art. XI, § 7 challenges to the sale-leaseback and bond issue, is controlled by *Hall*. The key is the City's payment of bona fide rent. The rent will be paid to Culinary Associates, used to pay Culinary Associates' loan from the Authority, and finally used by the Authority to pay the debt service on the Bonds. The Bonds will be secured by a mortgage on the Building and an assignment of Culinary Associates' right to receive the City's rental payments. Both forms of security will be held by the Trustee on behalf of the bondholders, but as long as the City continues to pay rent the Trustee will be unable to foreclose on the Building. The use of the rental payments by Culinary Associates, a private enterprise that will have substantial capital invested in the transaction, does not alter our initial conclusion that payment of bona fide rent does not create

debt under Art. XI, § 7. Neither does Culinary Associates' assignment of the right to receive the City's rental payments to the Trustee change that result. Even if Culinary Associates withdraws from the transaction after the City's obligation to pay rent has begun, the City's payment of rent directly to the Trustee will still represent payment of bona fide rent in exchange for the right to use the Building. As we held in *Hall,* this obligation to pay rent does not constitute debt.

## II

The City's authority to buy and rehabilitate the Building emanated from Art. II, §§ 15 (a) and (b) of the Baltimore City Charter, which give the City the power:

"(a) To acquire, within the boundary lines of Baltimore City, land and property of every kind, and any right, interest, franchise, easement or privilege therein, including land or property and any right or interest therein already devoted to public use, by purchase, lease, gift, condemnation or any other legal means, for development or redevelopment, including but not limited to, the comprehensive renovation or rehabilitation thereof; provided, however that any land or property owned by the State of Maryland or the Housing Authority of Baltimore City shall not be acquired by the Mayor and City Council of Baltimore without the prior consent of the State or the Housing Authority of Baltimore City, as the case may be;

(b) To develop or redevelop, including but not limited to, the comprehensive renovation or rehabilitation of, any and all land or property acquired by any of the methods hereinbefore mentioned."

The City now contends, and the trial court so found, that § 15 (c) authorizes the proposed sale of the Building. Section 15 (c) provides that the City has the power:

"(c) *To sell, lease, convey, transfer or otherwise dispose of any of said land or property, regardless of whether or not it has been developed, redeveloped, altered or improved* and irrespective of the manner or means in or by which it may have been acquired, to the United States of America or the State of Maryland, or any department or agency thereof, or to any private, public or quasi public corporation, partnership, association, person or other legal entity, *for development or redevelopment, including but not limited to the comprehensive renovation or rehabilitation thereof* . . . ." (Emphasis added.)

The Eberharts contend that § 15 (c) authorizes the sale of property acquired under § 15 (a) only if the sale will further the development or redevelopment of the property to be sold. Because the redevelopment of the Building has already been accomplished, they argue, the Building's sale cannot be "for development or redevelopment" and therefore is not authorized by § 15 (c). The City responds that § 15 (c) authorizes the sale of the Building in order to allow recoupment of the funds expended for renovating and rehabilitating the Building and make those funds available for other development or redevelopment projects.

Property acquired pursuant to § 15 (a) may be disposed of under § 15 (c) regardless of whether the property has been "developed, redeveloped, altered or improved." In our view, the only restriction on the disposition of property under § 15 (c) is that the disposition must be "for development or redevelopment." There is nothing in § 15 (c), however, to suggest that the disposition must promote the development or redevelopment of the very property to be sold. Rather, the disposition must promote the City's general development or redevelopment efforts. Evidence before the trial court revealed that the proceeds of the sale of the Building are to be used for other development or redevelopment projects in Baltimore City. Because the proceeds from the sale will be used for development or redevelopment projects, the sale of the Building was authorized by § 15 (c).

## III

An industrial development authority may exercise its powers solely to accomplish certain enumerated purposes, among them relief of conditions of unemployment and promotion of economic development. Art. 41, § 266 A-2. The Authority, in its Resolution, found that these particular public purposes would be served by issuing the Bonds and loaning the proceeds thereof to Culinary Associates to aid in acquisition of the Building. The Eberharts apparently believe that none of the public purposes listed in the Authority Resolution will be served by helping Culinary Associates acquire the Building because there will be no change in the Building's use after the sale-leaseback is completed. They argue, therefore, that the bond issue will constitute an ultra vires act because the Authority's findings concerning the public purposes to be served, a prerequisite to issuance of the Bonds, have no basis in fact.

Section 266 B (f) provides that:

> "In any suit, action, or proceeding involving the validity or enforceability of any bond issued under this subheading or the security therefor, any finding by the legislative body of the municipality or county in regard to the existence or relief of conditions of unemployment, ... the promotion of economic development, ... and the promotion of the. health, welfare and safety of the residents of such municipality or county shall be conclusive."

Although an industrial development authority is not a legislative body of a county or municipality, § 266 A-3 (a) (1) provides that, "an authority shall have all powers of its incorporating municipality or county enumerated in §§ 266 A through 266 H-1 and § 266-I (a) through (c) of this article." Moreover, § 266 A-3 (a) (2) provides: "A resolution adopted by the board of directors is equivalent to adoption of an ordinance or resolution by a municipality or county ...." It seems clear, therefore, that § 266 B (f) applies to findings made by an industrial development authority.

The findings in the Authority Resolution, according to § 266 B (f), are conclusive. The Eberharts argue that this legislative mandate of conclusiveness unconstitutionally precludes judicial review of the Authority's findings. We need not, however, address this issue. If there is a rational basis for the Authority's findings, then these findings must be upheld. The circuit court summarized the stipulated deposition testimony of the Authority's secretary and treasurer in the following manner: "the Institute's operation provides a valuable local training resource for the food service industry; ... the City's legally binding commitment to maintain the Building for 30 years makes it more likely that the Building will remain as the Institute's permanent home than if the Building were sold outright to a third party; ... the lease obligations by the City assures the continued upkeep and development of the Building for a long period of time; and ... the transaction will provide additional cash to the City for capital projects which otherwise would not be funded at all."

We agree with the circuit court that this evidence supports a conclusion that the Authority's findings had a rational basis. The Authority's issuance of the Bonds, therefore, will be in compliance with § 266 A-2 and will not constitute an ultra vires act.

The proposed sale-leaseback and accompanying bond issue will not create debt, the sale of the Building is authorized under Art. II, § 15 (c) of the Baltimore City Charter, and the Authority will be acting within the scope of its powers as defined in Art. 41, § 266 A-2.

*Judgment affirmed with costs.*

*Smith, J., dissenting:*

I dissent. With apologies to Gertrude Stein, a debt is a debt is a debt is a debt.[1] The attached diagram may make what is proposed here a bit more plain.

---

1. Gertrude Stein, *Sacred Emily,* "A rose is a rose is a rose is a rose."

"Economy in government is at all times a commendable virtue; at the present it rises to a point of importance never before felt by our people. It is an essential necessity to save us from pecuniary suffering, if not from hopeless bankruptcy. But in the midst of this startling condition of things, the sad experience comes home to us that economy in the use of public money, is a virtue seldom cultivated, and still more rarely practiced.

"The hands of those controlling city affairs, judging from past records, know no restraint, and seem lost to the virtue of economy. Where the public treasury is open to the cupidity of the unscrupulous, and not guarded by moral integrity there is little hope for the tax payer."

\* \* \*

"The effect of public debt upon communities, is the same as debt upon individuals. It shuts the door of hope — dispirits and paralyzes their energies. A public debt is a public calamity that curses the living, and wastes the estate of the dead. Its enormity at this time in the several departments of our government, is a source of serious alarm to the prudent and thoughtful. So great is the debt of the Federal and State Governments, that when added to those of a local and municipal character, an army of agents and tax-gatherers, at great expense to the people, have to be maintained to gather from them the means to pay the interest, much less the principal. Every branch of industry feels the burthen; every transaction, great or small, has some burthen upon it; property is burthened; the earnings of toil, whether of body or mind, is visited; the home that shelters is taxed; the garments we wear are taxed; the bread that satisfies our hunger is taxed; everything is taxed. No man is so much dreaded and shunned as the tax-gatherer. The rich hide themselves to escape his inquisitorial visits. The poor meet him with sad and angry countenance. His

presence is everywhere and among all men, like the blight that kills and the pestilence that desolates, and leaves little else than grief and suffering."

The above is *not* the cry of outrage as to the high cost of government by a present day group of citizens. It is a part of the report of the Committee upon Public Works and Corporations appointed by the Constitutional Convention of 1867. *See Proceedings of the State Convention of Maryland to Frame a New Constitution* 546, 547-48 (1867). Thus, it represents the background for the adoption of the constitutional provision we now have before us. The committee was "instructed to investigate such of the proceedings of the Mayor and City Council of Baltimore as m[ight] be deemed necessary by said Committee, and particularly relative to the endorsement by the city of Baltimore of the Union Railroad Company's bonds, and to the building of a new City Hall ...." Although the near bankruptcy of the State prompted limitations in the Constitution of 1851 on the State's use of credit, no restriction as to Baltimore City such as that now before us was found in any Constitution prior to that of 1867. With that background, it is no wonder that in *Baltimore v. Gill,* 31 Md. 375 (1869), arising but a very short time after the adoption of the constitutional provision now before the Court, Chief Judge Bartol said for the Court:

"The Constitution is not to have a narrow or technical construction; but must be understood and enforced, according to the plain and common sense meaning of its terms.

"The plain intent of this section is to restrain the municipal government of Baltimore from borrowing money, except for the purposes and in the manner prescribed, either upon the general credit of the city, or by a pledge of its revenues or assets; thereby creating a debt, and imposing additional burdens upon the citizens, which may directly or indirectly involve increased taxation." *Id.* at 390.

Nobody has suggested that Chief Judge Bartol's admonition is not good law today. In *Hall v. City of Baltimore,* 252 Md. 416, 250 A.2d 233 (1969), Chief Judge Hammond said for the Court, "The precise holding of *Gill* was that a pledge or mortgage of existing municipal assets creates or constitutes a debt . . . ." *Id.* at 425.

I cast no aspersions upon the good intentions of those in authority in Baltimore City who have recommended this financing. Likewise, I have no reason to doubt that those responsible for what was before the Court in *Gill* acted in accordance with their conception of what was in the best interest of the Baltimore populace. The fact remains, however, that this Court said they went beyond permissible limits. Also, I have no reason to cast doubt upon the motivations of those legislators of the first half of the 19th century who voted all kinds of aid for railroads, canals, and the like, bringing the State to the very brink of bankruptcy. See the extensive discussion by Judge Boyd for the Court in *Bonsal v. Yellott,* 100 Md. 481, 498-99, 60 A. 593 (1905), concerning the restriction on loans and extension of credit as to the State contained in Maryland Constitution Article III, § 34. The constitutional provision is there, however, and we must deal with it. It is not concerned with good faith.

In a generation before the abolition of dower the Court looked at an entire transaction to determine whether or not dower attached. Thus, where property was conveyed to a husband who immediately executed a mortgage for a part of the purchase price the husband was regarded as a mere conduit and the transaction an instantaneous one to which dower did not attach, whether the mortgage was made to the vendor or to a third person furnishing the money.[2] *See Glenn v. Clark,* 53 Md. 580, 604 (1880); *Price v. Hobbs,* 47 Md. 359, 382 (1877); and *Rawlings v. Lowndes,* 34 Md. 639, 644 (1871). Similarly, we must examine the transaction here as a whole, not its individual parts.

---

2. Nevertheless, until dower and curtesy were abolished by Chapter 3 of the Acts of 1969, most careful scriveners had wives or husbands, as the case might be, join in purchase money mortgages for the purpose of releasing claims.

As I see it what we have here is a high-class deal which seeks to camouflage the true intent. The City owns land with a building erected upon it. It proposes to make a thirty-five year lease of the land to Culinary Associates. It also proposes to sell that corporation the building and then to lease back for a thirty year period the land and building. Through its alter ego it will loan the purchasers the money with which to buy the building. It is to be specifically noted that under the terms of the lease of the building to the City what the City pays by way of rent *must at all times be an amount necessary to meet the debt service on the bonds.* The new owners are a mere conduit. Moreover, if one were to examine tables for the amortization of loans such as those published by Financial Publishing Company of Boston, and regularly used by financial institutions, one would find a striking similarity between the rent payments the City is to make here to Culinary Associates for the building and such amortization tables based upon the probable interest rate involved. The ground rent proposition is a delusion. The sum due the City on the ground it has leased to Culinary Associates is $6,000 per year, the precise sum which the City is to pay Culinary Associates for its lease of the land to the City, thus making the ground rent a washout.

At oral argument I suggested from the bench that stripped of all that has been put around it this transaction was no different from that where one goes to a bank and borrows, giving a note to be amortized over a thirty year period together with such collateral, mortgage or otherwise, which the lender might require. To this counsel for the City retorted that I failed to take into consideration the five year interim between the expiration of the lease of the building by Culinary Associates to the City and the expiration of the ground lease from the City to Culinary Associates, stating that in that period the Associates could tear down the building. This impresses me not one bit. The day has long since gone when one can induce a person to tear down even a small building for the material in it. Demolition costs money. The building will not be torn down in that interim. It will revert to the City. It is perfectly true that the building may be rented

to someone other than the City during that five year period, but the economic facts of life are that such rental probably would be on a somewhat reduced basis because of the knowledge that the entire building would revert to the City. The location would not have the same allure for a prospective tenant who knows that it is uncertain as to whether he may remain at that location at the expiration of the ground lease from the City to Culinary Associates.

I fail to see how *Hall* has any bearing on this case. The successful bidder there was to erect a building on City property which the City was then to lease for a specified number of years. The City had an option to buy, but there was no requirement or compulsion that it buy. The price, if it did buy, was to be determined by an appraisal of fair value at the time the option was exercised. The transaction there was not one where the rentals paid were to be applied or credited on the amount of the purchase price. We very carefully pointed out there:

> "The rentals are fair and reasonable compensation for the occupancy and use of the warehouse, no part of the rent is to be applied to or credited on the purchase price (compare *Beckwith Machinery Co. v. Matthews,* 190 Md. 182, [57 A.2d 796 (1948),] holding a purported lease to be a sale because the option price was the same as the aggregate rental payments for which the purported lessee was given credit), the option is completely and truly non-compulsory, and the purchase price is to be determined by appraisal of real value at the time of the exercise of the option." *Id.* 252 Md. at 427.

The decision in *Hall* is in line with the comment by Bowers, *Limitations on Municipal Indebtedness,* 5 Vand. L. Rev. 37 (1951):

> "The courts have insisted that such leases be true rental arrangements, not disguised purchases. Thus, if it is really a contract for an improvement, with only payment being postponed, it is invalid.

Too, if the lease calls for conveyance of the property to the city upon termination of the lease, with little or no additional payment, it is generally considered a purchase and not merely a lease, so that a debt for the whole sum arises. A mere option to purchase does not create a debt, however." *Id.* at 51-52.

The scholars have not looked with favor upon transactions such as that in the case at bar. For instance, Magnusson, *Lease-Financing by Municipal Corporations as a Way Around Debt Limitations,* 25 Geo. Wash. L. Rev. 377 (1957), cited by the majority opinion, states on the very first page, "Lease-financing is not really renting, but is borrowing." The author goes on to comment in language strikingly applicable to this transaction:

"It seems apparent that lease-financing is actually borrowing by another name. To contend that the method of payment alters the fact of payment strains ratiocination. Unlike ordinary leases, these leases are in practice non-terminable, nor do the parties ever intend to terminate them. The amounts paid as 'rent' are not the use value of the property, as true rent would be, but equal debt amortization charges on the full cost of the facility financed. Moreover, securities analysts would probably treat these charges not as current expenses, which rent would be, but as repayment of a long term debt. Nor are these 'leases' aimed at temporary use, as is the ordinary lease, but at acquisition of title. The only variation between these 'rents' and debt service is in the legal web woven around the transaction." *Id.* at 390.

\* \* \*

"The duty to pay future rent in a long term lease is just as 'present' as the duty to pay each installment of debt service on the bonds back of the rent. The leases could not be terminated without the payment of damages or without being subject to injunction or mandamus to keep on paying.

> Breaches of agreements or failure to perform would be subject to having a trustee take possession and carry out the required performance." *Id.* at 391.

At oral argument counsel for the City said he felt "comfortable" in issuing an opinion to the effect that the City's obligation to pay rent here is a legally enforcible full faith and credit one. Eberhart claims, with justification I believe, that the transaction would not be economically viable were it not for the City's legally enforcible obligation to pay rent. *See also* Nichols, *Debt Limitations and the Bona Fide Long-term Lease With an Option to Purchase: Another Look at Lord Coke,* 9 The Urb. Law. 403, 417-18, 420 (1977). Rogers, *Municipal Debt Restrictions and Lease-Purchase Financing,* 49 A.B.A.J. 49 (1963), comments:

> "So long as debt limitation provisions are a part of the constitutions and statutory law of the various states, it would seem that lease-purchase financing will remain as an instrument of circumvention. The most logical and forthright remedy perhaps is an overhaul of municipal debt restrictions. Taxpayers frequently have shown a dismaying reluctance to approve indebtedness for desperately needed municipal facilities. Perhaps the reason that no frontal attack on overly restrictive constitutional provisions is made is a fear that voters would refuse to modify such provisions adequately to meet the need. It is submitted, however, that if overhaul is truly needed in these times of great need on the part of states, counties and cities, the most effective manner of bringing about this change is for courts to construe strictly and enforce vigorously the existing debt limitation provisions. After all, courts were constituted not to repeal provisions of the Constitution, but to construe them." *Id.* at 53.

*Bowers, op. cit.,* concludes his article by stating:

> "Whatever conclusion one reaches as to the form the limitations of the future should take, there is

little dissent from the proposition that the success or failure of a particular financing plan should not be made dependent upon how well local ingenuity succeeds in fitting it into the framework of established evasions. Indeed, one is shocked to find that the courts have been so ready to look merely to the form of the proposed plan, leaving its substance and effect to evade the debt restriction. The judicial process is not often seen in so complacent a position in other fields, even where the reasons for liberality are more impressive." *Id.* 5 Vand. L. Rev. at 53-54.

In *Johns Hopkins Univ. v. Williams,* 199 Md. 382, 396, 86 A.2d 892 (1952), Chief Judge Marbury quoted for the Court from *Jarrolt v. Moberly,* 103 U.S. 580, 26 L.Ed. 492 (1880), where Justice Field said for the Supreme Court, "It would be a narrow and strict construction of the constitutional provision to hold that it prohibited the creation of indebtedness by a municipality by a direct use of its credit for the railway company, and yet permitted such creation by the indirect use of it for the same purpose." *Id.* at 585-86. I would add the next sentence, "A constitutional provision should not be construed so as to defeat its evident purpose, but rather so as to give it effective operation and suppress the mischief at which it was aimed." *Id.* 103 U.S. at 586.

The mischief at which this constitutional provision was aimed was the uncontrolled creation of debt by the City. The imposed restriction was to require debt to be subject to the approval of the voters of the City. Stripped of all dross, trappings and camouflage, what we have here is a municipal asset which the City is to pledge as security for money advanced to it which it is to pay back over a thirty year period. That is a debt. At oral argument the City argued, "The only thing the City has signed or executed that is an obligation is the lease itself. There are two layers of non-recourse notes, but in terms of what the City has done it has only signed the lease. . . . We and the City Solicitor are of the view that the thirty year lease is a full faith and binding obligation for that thirty year period . . . ." It is to be

noted specifically, however, that the City's obligation to pay is not based upon the economic worth of the building, but is to pay not less than the sum necessary to cover the debt obligation. In other words, the City's taxpayers in the opinion of the City Solicitor are bound to pay over a thirty year period an amount not less than that required to amortize the debt. In my book a debt has been created.

We are derelict in our duty to the people of the City if we do not hold that under the constitutional provision this transaction must be submitted to the City's voters for their approval.

Judge Digges authorizes me to say that he concurs in the views herein expressed.

1. $6,000 a year ground rent payable by Culinary Associates to City.
2. Rent = $6,000 grd. rent + Amt. to cover debt obligation + the 3% return for the private investors.
3. Actual amount raised was $315,000, only $280,000 used for purchase, $35,000 went for fees. Private investors receive 3% return on the $315,000.